Statement of the Case.
MONROE, J.
Defendant (company) being engaged, in Philadelphia, in the manufacture and sale of “Globe marine gasoline engines,” and being “represented” in New Orleans by Theodore Grünewald, plaintiffs bought from the latter a certain engine, No. 2,663, of the kind mentioned, which was intended for, and installed in, their yacht, or dispatch boat, De Soto, and they now sue .defendant for damages, alleging that they were the victims of a fraudulent imposition, in that the engine has -but 75 horse power, whereas it was sold to them as of 100 horsepower, and further alleging that it broke-down by reason of the defective material of which it was built; that they forwarded it to the defendant’s shop for repairs under an agreement that the repairs should be. completed within about 10 days; and that they were not completed for several months. They claim $1,500 as the difference between the value of the 100 horse power engine, which they bought and paid for, and the 75-horse power engine, which was delivered to-them; $6,000, for loss occasioned by the delay in the completion of the repairs; and $1,000 as the amount that it will cost (apart from the difference in price) to replace the-engine, delivered, by an engine such as they contracted for. The suit was begun by at *211 tachment, and Grünewald, having been garnisheed, answered, that he was indebted to defendant in a certain amount, whereupon his answers were traversed, but defendant, after preliminary pleadings by the curator ad hoc, having answered by its own counsel, the proceeding against the garnishee was suspended to await the result of the trial on the merits.
Defendant by way of answer alleges, in effect, that Grünewald was “its sole local selling representative” — that is to say, that he “was to solicit sales of its engines in this territory, and defendant was to sell him the engines at fixed prices and permit him to sell them to his customers at whatever prices he might see fit to charge, it being agreed that all inquiries from this territory concerning the purchase of such engines should be referred to him”; that, under their agreement, defendant sold to said Grünewald the engine in question, as of 75 horse power; and that, if in selling it to plaintiff he represented it to be of 100 horse power, such representation was unauthorized, and defendant is not responsible therefor; that a certain rod in the engine having broken and wrecked other parts, Geo. B. Christie, one of the plaintiffs, on February 18, 1907, called on defendant, and it was agreed “inasmuch as the break * * had been due to a hidden defect in the metal * * * and as respondent had guarantied the material and construction of the engine, that respondent would repair the damage * * * caused by the said break, but * * * when respondent promised to make said repairs within 10 days, it was on the distinct condition that the said engine should be received by respondent in Philadelphia within 10 days from said date, or not later than February 28, 1907;” that the engine did not reach Philadelphia until March 21st, two days before respondent shut down its plant in that city and one month before it removed to Eddy stone; and that, when it resumed operations at the place last mentioned, “its plant and working force were in a more or less disorganized state, and great difficulties were encountered in manufacturing and replacing the broken parts of the said engine, but that the said repairs were made and the said engine returned with all possible dispatch.” Defendant alleges that Christie was informed on February 18, 1906 (meaning 1907), that the engine had been sold to Grünewald as of 75 horse power, and that plaintiff’s engineer, Neal, so wrote to them on March 9, 1907, and that, should it be held that Grünewald ' was defendant’s agent, the claim for damages, based on the alleged deficient horse power, is barred by the prescription of one year. Defendant further alleges that in view of the fact that plaintiffs were so informed, and yet had the engine repaired and reinstalled without protest in regard to the horse power, they are now estopped to set up that claim, and, further, that the yacht in question was used for pleasure, and that they sustained no pecuniary loss by reason of the delay in making the repairs.
The facts as we find them are: That plaintiffs at the time of the occurrences out of which this suit has arisen were engaged under a contract with the government of the United States, involving several millions of dollars, in the work of building the jetties at the Southwest Pass of the Mississippi river, about 115 miles below New Orleans. For the purposes of that work, they were employing some 800 men and a number of tugs, barges, and boats of other kinds, were cutting “willows” along the river bank as far up as Natchez, and were quarrying rock in Alabama and transporting it, by rail, to a point a few miles above this city, whence they were shipping it down the river to the Pass. In order to attend to and oversee the business thus carried on at many places and by many persons hundreds of miles apart, *213 and between which, and whom, the means of communication were in some instances nonexistent, and in others inadequate, they found it necessary to build a dispatch boat at a cost of about $20,000, of which the sum of $±,650 was paid for the engine here in question, together with some other apparatus. Defendant’s relation to the contract by which the engine was acquired and to the other matters set forth in the petition will appear from the following résumé of the evidence, to wit:
On December 26, 1905, plaintiffs wrote to defendant that for their new yacht, then building, they would require a gasoline engine and other specified machinery, and apparatus, and asking at what price defendant could sell, and when install, the same. Defendant answered on December 29th, saying:
“We have your favor of December 2Gth, in which you request us to give you quotation on a gasoline marine engine for use in a yacht that you are now building, but, if you will refer to the copy of your letter you will see that you have not stated what size engine you will require; we have, therefore, referred the matter to our representative, Mr. Theodore Grünewald of your city, and have asked him to take the matter up direct with you and give you full particulars. Trusting that we may be favored with your valued order, through our representative, in the near future, we beg to remain, very truly yours, Pennsylvania Iron Works Com•pany,” etc.
The letter to Grünewald, written on the same day, reads:
“We are inclosing herewith a copy of a letter received from Messrs. Christie & Lowe, 410 Morris Bldg. New Orleans. You will see these parties have not stated what size engine they will require, and we would request that you would call on them at your earliest.convenience and ascertain what kind of a machine would be required. We have written these parties that you are our representative in New Orleans and that you will give the matter your prompt attention. Very truly yours, Pennsylvania Iron Works Co.,” etc.
Up to the time of the meeting, resulting, eventually, from the foregoing letters, plaintiffs had no acquaintance with Grünewald, nor he with them; but it appears that prior to 1902 Grünewald had been interested in a concern known as the Gardiner Motor Works, the plant of which had burned, and that on January 4, 1902, he had written to defendant to that effect, saying, also, that the concern had some orders for engines which it was unable to fill, and might place with defendant if proper discounts were allowed ; the result being that Mr. Audenried (now defendant’s president) came to this city, and, after some negotiations, made Grünewald a written proposition, which was accepted by him, and which reads:
“Confirming the verbal statement made to you this clay. I desire to say that my company, the Penna. Iron Works Co., of Philadelphia, would like to arrange to have you represent them for the sale of our Globe marine engines. If you decide to handle our engijie, we will allow a discount of 35% from our list price,-as shown in catalogue. Also, on a 35 H. P. engine, for yourself, our price would be $1,600, which price would include the services of a man to supervise the installing of engine. On the 3, 50 H. P.. that you have orders for, our price would be $2,200, each. These prices on the 50 H. P. and the 35 H. P. engines do not include tanks, batteries or magnetors, which I understand you do not want.”
Mr. Audenried, testifying in this case, says that the contract gave Grünewald the right to buy defendant’s engines at the discount agreed on, and to sell them, but that:
“He was not, in any way, authorized to bind us, except that we transferred our guaranty. We agreed to keep our guaranty.
“Q. In other words, your guaranty was in the catalogue and it followed the engine? A. Yes, sir.
“Q. Yotí would have felt called on to make the guaranty good — no matter to whom the engine was sold? A. Yes, sir.”
The guaranty referred to is conspicuously printed in defendant’s catalogue, and reads:
“Guarantee.
“Every Globe engine is guaranteed to develop the brake horse power at which it is rated, and is also guaranteed, for one year, against imperfect workmanship and defective material. By this, we mean that, if the engine becomes disabled in that time, through either of these causes, we will send a new part to replace the broken one, free of charge, provided the broken part is returned for our inspection.”
*215 In the course of the cross-examination, counsel for plaintiffs propounded to the witness the question, and the answer was given, as follows:
“Q. I ask you if you do not regard your selling agents as authorized to quote the horse power of the engines that they sell? A. They were authorized to quote the horse power, unquestionably, in my_ mind, to the extent that, if they had not any information to the contrary, they could say to the customer that it was a 10 or 15 or 120 horse power — whatever they may have bought it at.
“Q. And the way you informed your agents of the horse power of engines was by your catalogues and the special correspondence that you had with them on the subject? A. Yes, sir.”
Grünewald testifies that he bought the engines that he handled outright, and that he sold them to whom and at what price he pleased; but he says that he nevertheless understood that in making the sales he was acting as the agent of defendant; and as to any representation made by him concerning the horse .power based on information obtained from defendant through its catalogues or letter or concerning the soundness of the material or the quality of the workmanship of the engines he and defendant’s president are agreed on that point. The evidence places it equally beyond dispute that plaintiffs bought the engine here in question from Grünewald as being of 100 horse power, and that Grünewald had bought it from defendant as being of that capacity, and knew nothing to the contrary, up to the time of the sale to plaintiffs; the facts leading up to and connected with those transactions being as follows:
On March 3, 1905, Grünewald telegraphed to defendant that he wanted an 85 horse power engine for his yacht Josephine, and on March 6th defendant wrote to him saying:
“We telegraphed you to-day as follows, which we beg to confirm: Gan ship 85 horse power by 20th instant. Have canceled shaft order. In this connection, we would say that we can furnish you with one of 85 H. P. high speed engines, weighing 4,000 pounds, by the 20th of the month. However, we are getting out an engine which will develop over 100 H. P. and which we think will be even better than the 85, and we will be in a position to ship this by the end of April. * * • Please let me know, on receipt of this, whether you can wait for the engine that length of time or whether we shall go ahead and ship the 85 H. P. that I have-referred to.”
On March 9th Grünewald telegraphed that he would wait for the 100 horse power engine, and'on March 19th he wrote saying:
“In answer to your several letters, I beg to-say that I have decided to wait for the 100 H. P. engine,” etc.
The engine was accordingly completed, but it was billed and shipped as “One J. J. 75 H. P. marine engine, No. 2662,” and, a man named Kloidt, whom defendant had sent down to install it, having spoken of it as a 75 horse power engine, Grünewald wrote and telegraphed on the subject and elicited, a letter of reply, dated June 5, 1905, in which defendant says:
“Replying to your letter of June 2nd andyour several telegrams, of June 1st and June 2nd, we beg to say that, as we entered the order, it called for a 100 H. P. engine, with propeller. * * * This was in accordance with our letters of March 23rd and April 10th. * * * In reference to Kloidt’s referring to-the engine as a 75 H. P. engine, I would say that this is the first 100 H. P. engine which went out. He has been accustomed to working on the 75 H. P. machine and I have no doubt that that is the reason he gets confused. There is absolutely no question that the engine runs 100 H. P. I cannot account for the mistake of our shipping department, calling it a 75 H. P. engine, except that the people in the shop always referred to the reversible type machine as a 75 H. P. engine.”
The assurance thus given satisfied Grünewald that the new engine, No. 2,662, known as of the “J. J.” type, was of 100 horse power, and it was duly installed in his yacht, concerning which and the prospective installation he had, in his letter of March 19th, written to defendant:
“My boat, the Josephine -is the biggest advertisement we have in this part of the country for the Globe engines, and, if the new 100 H. P., you recommend will do the work, I have every reason to believe we will derive very big results from her successful performance.”
On October 12, 1905, defendant, by Audenried, president, wrote to Grünewald, sayings
*217 “Replying to your several favors of the 2nd and 5th instants, I beg to say that we are now building, in the air reversing type, engines of 100 H. P. and 50 H. P. sizes — have finally listed these engines as follows: 100 H. IP. three cylinder, air reversing engine $4,000; discount to agent, * * * which would make a net price of -. This price includes engine. « * * We are in position to ship one of these engines in two weeks from date of order. * * *»
On January 20, 1906, Grünewald telegraphed defendant:
“Sold to-day one hundred horse power, three •cylinder, engine: March delivery, letter follows.”
And on the same day he wrote:
“I have, at last succeeded in closing for a 100 H. P. engine and should like to get the delivery some time in March. I sold this engine to Mr. P. J. McMahon, for the boat which he is now building.”
In the meanwhile, on December 29, 1905, ■defendant had received plaintiff’s letter of December 26th, and had written the answer, and the letter of advice on the subject to Grünewald, which we have already quoted, and Chas. D. Goslett, whom Grünewald had associated with him in his business, had ealleá on plaintiffs, the result being that on January 22, 1906, Goslett wrote to defendant, ordering some things that they needed, and saying:
“Under separate cover, we are forwarding you the lines of Messrs. Christie & Lowe’s launch, with their letter, which is self-explanatory. Kindly return blue prints when you have finished with them.”
It appears, however, that the blueprints mentioned must have been a set which had been borrowed by plaintiffs when they first began to consider the question of building a yacht, but which were not used; the vessel actually built being 13 feet longer than that called for by said blueprints.
On January 23d (before Goslett’s letter of January 22d could have reached it) defendant wrote to Grünewald about various matters, saying, in conclusion:
“We are very much pleased to receive your telegram advising us of the sale of a three cylinder, air reversing engine, and we have entered the order and can make shipment in March as you request. The engine will be fitted with the new vaporizer and multiple feed oilers and we propose to balance the cranks to help vibration. I think, also, it will be well to cut down the compression, somewhat, which would reduce the power, but will wait to get your instructions on the point. We have almost made up our minds to do this and rate the engine at 75 H. P., although not change the price. The engine will be put up to date in every respect.”
On January 27th defendant wrote to Grünewald:
“We beg to acknowledge receipt of the blue print of the boat belonging to Christie & Lowe, which shall have our attention and you will receive the estimate on furnishing a 100 H. P. Globe engine for this boat in the course of a few days.”
In a letter of February 1st, defendant furnished the estimate thus referred to and wrote:
“In Mr. Audenried’s letter to you of January 23 he mentioned the fact that he was thinking seriously of taking some of the compression out of our ‘J. J.’ engine, listed in our new catalogue at 100 H. P., in order to eliminate the vibration of the machine. Of course, if this was done, the power of the engine would be reduced, and, as Messrs. Christie & Lowe’s boat is essentially a speed boat, and, naturally, built much lighter than the average pleasure craft, we have decided that it would be better to offer you the above mentioned engine as a 75 I-I. P. machine. * :|! * Our price on a 75 H. 4?., self starting and reversing engine, as per agents list, to you, is 55% from the price list, or $2,700, net.”
We may here remark, however, that Grünewald never gave any instructions for the reduction of the horse power of the engine that he had sold to McMahon, and that defendant never considered that its intention or decision as expressed in the letter last above quoted in regard to the reduction of the horse power of its “J. J.” type of engines had any application to that engine, and Mr. Audenried so specifically admits in his testimony.
On February 1st (the same day that the last of the above-quoted letter was written) Grünewald wrote to defendant:
“We may safely say that our chance of getting the Ohristie & Lowe order is very small, *219 they being in a hurry, whilst the estimate from you, which ought to have arrived by return mail, seems to be hung up somewhere.”
In fact, though Grünewald made one or two proposals to plaintiffs, they contracted for an enginewith a San Francisco concern, by which the engine was crated for shipment when it was destroyed by fire. Plaintiffs then resumed negotiations with Grünewald, who, finding that McMahon, whose boat was not likely to be ready for some time, was willing to give up the engine that had been ordered for him, and take another to come later, sold them (plaintiff) that engine, and, in order to protect his contract with McMahon, telegraphed to defendant, “Will want the other ‘J. J.’ engine, 60 days, sure, am writing” which telegram was followed, two days later, by letter, of date May 4, 1906, in which he wrote:
“Mr. McMahon’s 100 H. P. engine has been sold to Messrs. Christie & Lowe, he, kindly consenting, but, as McMahon’s boat is well under way, we request that, if you can possibly deliver the 100 IT. P. ordered by him the other day, in less than 60 days, you will do so.”
In the meanwhile, on March 27th, defendant had written to Grünewald:
“We wish to inform you that your telegraphic order, of January 20th, for 100 H. P., 8 cylinder, engine is about completed; the engine is now being painted and we would ask that you send us shipping direction. * * * ”
And on April 26th the engine was shipped as “J. J.J 100 H. P., engine No. 2,663.” On May 9th defendant wrote to Grünewald:
“We note that the 100 IT. P. 3 cylinder, engine, shipped for Wm. McMahon, has been sold to Messrs. Christie & Lowe, and will make this notation in our records. There is not the slightest possibility of our being able to deliver the other engine in less than 60 days, but you can rest assured that we will use every effort to have it sent at the time stated.”
The engine No. 2,663 having been installed in the De Soto, plaintiffs had occasion some time later to order various things in connection therewith, and defendant, in preparing shipping lists of the same, of dates October 9, 17, 29, and November 12, 1906, described them as: “For J. J., 100 H. P., Engine, No. 2,663.” On October 9th defendant wrote to plaintiffs, saying:
“We are in receipt of your telegram of the 8th instant, requesting that we ship you one set of case hardened ball bearings for your 100 IT. P., Globe, engine, to which we have just replied that we expect to be able to send these forward to-morrow by Adams Express.”
And on October 27th defendant wrote topi a intiffs :
“We have your favor of the 24th instant; also, express package containing broken water pump plunger, from 100 H. P. engine No. 2663. We will proceed to fit this- part with a new plunger and return to you,” etc.
On the subject of the relations which subsisted between defendant and Grünewald and the character in which the latter was held' out, we find in addition to defendant’s letters to plaintiffs and to Grünewald, which have been quoted, other letters to the same effect, to wit:
May 8, 1905, to Lopez & Dukate, Biloxi,. Miss.:
“We are represented for your district by Mr. Theodore Grünewald, of New Orleans, and we have to-day, written him requesting a price to be given you immediately on your requirements.”
June 9, 1904, to Alack Froment, Jeannerette, La.:
“We would suggest that, if you would correspond with our Louisiana representative, Mr. Theodore Grünewald, of New Orleans, and,”' etc.
March 14, 1905, to Kennesy Oyster & Fish Company, Rigolets, La.:
“We are unable to quote you on an engine for the reason that we are represented for the-sale of our machines, in your locality, by Mr. Theodore Grünewald,” etc.
May 15, 1905, to Theodore Grünewald, in reference to Messrs. Tappan & Westcott, of Biloxi, Miss.:
“We have written them .that we are already represented in the state of Mississippi by you and have told them that you would write to them in the near future,” etc.
*221 February 2, 1906, to W. R. Irby, New Orleans :
“Regarding prices, etc., we would refer you to Mr. Grünewald, or Mr. Goslett, his assistant, both of whom you are acquainted with,” etc.
On November 17, 1903, defendant wrote to Grünewald:
“We have come to the conclusion that our selling representatives can be of considerable assistance to us by giving us the news of the locality in which they are situated. In other words, whenever you hear of any items of news, such as the sale of engines of rival concerns, prices asked by other gas engine makers, the success or failure of any machine, whether our own or other makes, new concerns starting the manufacture of engines, etc., write us a report; all this information will be of use to us,” etc.
On December 14, 1904, defendant wrote to Grünewald:
“In looking over our files for some time back, we find that there have been a few engines sold by you and that we have not been furnished with the names and addresses of the owners of the same.
“We have written you a number of letters on this subject and you fully understand what we wish. It is absolutely necessary to our business that we have this information, as parties frequently write in for repairs and if we have not got their engine No. it causes considerable delay and inconvenience. Please, in future, when sending in orders, place the full name and address of the purchaser on the order. We must insist on your doing this in every case.”
To which letter Grünewald answered (in part):
“In reply to your favor of the 14th instant, the names and addresses of customers will be forwarded as soon as possible.”
Plaintiff’s boat, with the engine installed, made a trial trip on August 9th, and two other such trips at later dates, and went reg. ularly in commission on August 31, 1906. During those trips and afterwards there were some accidents, and on January 16, 1907, a connecting rod broke and smashed things rather badly. On January 21st plaintiffs wrote to defendant, inclosing the report of their engineer to the effect that the break was attributable to a flaw in the rod, saying that the boat was laid up, and that they were anxious to have something done, and requesting defendant to advise them what to do. Defendant allowed the latter to remain unanswered until February 18th, when Christie went to its office in Philadelphia, accompanied by Mr. Robert Lederle, and, after considerable discussion, Mr. Audenried, defendant’s president, in the presence of the others, dictated an answer (to plaintiffs’ letter of January 21st), which was intended and accepted as a binding obligation, and which reads:
“Replying to your favor of Jany. 21st, and following the visit of your Mr. Christie, this morning, we beg to say that if you will return your engine out of the yacht De Soto, we will repair it and put it in first-class condition, and make no charge for same. We intend to put in new pis'tons, new connecting rods, connectingrod boxes, and furnish the new cylinder necessary, caused by the break of the middle cylinder. Please return all parts to us and have same properly crated so that they will not be lost or broken in transit. It will take us about ten days, after we receive the engine, to rebuild it and reship it to you.”
Christie testifies positively that nothing was said about their delivering the engine in Philadelphia in 10 days, and he is corroborated by Lederle. ° On the other hand, whilst defendant’s position is that such delivery was made a condition to the completion of the work within 10 days therefrom, we find that Mr. Audenried in the course of his testimony says:
“I assumed that I was going to have the engine back in ten days, * * * because I had been told, and we had figured it to be back in 10 days.”
Being asked, “Well was that understanding and agreement, that it would be back in 10 days, the basis of your agreement to repair it,” he answered:
“Well, I never would have consented in the condition of our shop and moving to say that he was going to get his engine back in 10 days, unless I was told that I could get it in the shop in 10 days to start to work on it.”
*223 The engine was, however, still in the yacht in New Orleans, and it would have been next to impossible for plaintiffs to. have delivered it at defendant’s shop within 10 days.
■ Mr. Audenried also testified that upon the ■occasion of the interview referred to Mr. Christie was informed that the engine was ■of 75 horse power, instead of 100 horse power, though apparently he (Christie) made no comment upon the information.
Christie denies that anything was said about the horse power, and, again, is corroborated by Lederle, and, as we think, by the circumstances of the case. He and his partners had ordered a 100 horse power engine, and had paid the price, and, though there had been some gossip on the subject, they had never arrived at the point when they entertained more than a passing doubt that they had received what they had thus ordered and paid for. Under those circumstances, it appears to us very unlikely that Audenried would on that particular occasion and gratuitously have introduced that topic into the discussion. The engine was shipped from New Orleans on March 1st, and reached Philadelphia on March 21st, and in the meanwhile plaintiffs’ engineer, Neal, who had been sept on for the express purpose of looking after and hurrying the repairs, reached Philadelphia, say about March 9th, and began at once to visit defendant’s shop, where on March 13th he learned that plaintiff’s engine was of but 75 horse power, and on the same day conveyed that information by letter to plaintiff, whereupon Lowe (the junior member of the plaintiff firm) wrote to Lederle, whose friendly services they had engaged, inclosing a copy of the agreement under which the engine had been bought, and requesting him to ask defendant what horse power it had and what should have been paid for it, also requesting him to find out what defendant had to say about the matter, and Lederle endeavored to comply'with those requests. Audenried was, however, unwilling, even at that time, to discuss the question ; his attitude being disclosed by the following letter, of April 6th, addressed to him by Grünewald, and his answer thereto, to wit:
Grünewald to Audenried, April 6, 1907:
“Mr. Lowe, of the firm of Christie & Lowe, informs me that you told his representative in Philadelphia that the engine sold him, through us, was a 75 H. P., and not a 100 H. P. engine, and that, if the statement was made to Slessrs. Christie & Lowe that the engine was 100 H. P., it was made without the authority of the Pennsylvania Iron Works Company; that I did not represent you people here and that, consequently, I had no right to make any such statement.”
And the letter goes on to assert that the writer had represented the engine to be of 100 horse power because defendant had so represented it to him, and to call the attention of Audenried to his own recognition of the writer’s status as defendant’s representative.
Audenried to Grünewald, April 15, 1907:
“Mr. Christie had his engineer come to us and he also brought in and introduced to us a man by the name of Lederle, who has been making it his business to call us up on the telephone or come to see us pretty nearly every day since Mr. Christie was here. During the course of one of his visits, Mr. Christie’s engineer asked some of our men what horse power this engine developed. The man told him 75 H. P. This matter was then reported to Mr. Lederle and Mr. Lederle came to tell me that the engine had been bought from you as a 100 H. P. engine and told me that, as the engine was only a 75 II. P. engine, they proposed to hold us for the acts of our agent, Theodore Grünewald. I told Mr. Lederle I had no knowledge as to what horse power you had sold the engine at; that horse power was largely a question of speed at which the engine was run; and that, in view of the attitude that he took, I did not propose to make any statement as to what power the engine developed, except to state that we stood back of the horse power at which we had sold this engine, and that, inasmuch as we did not know what deal had been made between Christie & Lowe and Mr. Grünewald, we did not propose to enter into any discussion of this kind. Further than that, we stated that, when he talked of holding us responsible for the act of our agent, Mr. Grünewald, there was a point we wanted him to understand, at the start: i. e., that we had no agents, in the sense of the *225 word that he used it; that all our representatives were merely selling representatives; that a territory was assigned each of these representatives and inquiries from that territory referred to them; that we, however, sold these representatives, direct, and they purchased and paid for the engines themselves, afterwards reselling them to their own customers; that, in other words, we had no commission agents; and that we were not bound, in any way, by the acts or statements that any of these representatives made, further than the guarantee that we gave them, which guarantee is clearly set forth in our catalogue. * * *
“Now, in reference to what the actual horse power of this engine is, we would say that it actually developed somewhat over 75 H. P., and, in this connection, we would call your attention to our letter of January 23rd, 1906, and also our letter of Febry. 1st, 1906. * * * As a result of the disagreeable attitude that Mr. Lederle has taken on behalf of Christie & Lowe, I have refused to let his engineer come in our works and I propose to see that we are paid for the extra work that we are doing, on their order, before the engine is permitted to go out of our works. I might add that Mr. Lederle, on behalf of Christie & Lowe, came to see us and wanted a record of our test and full information regarding this engine, saying that there had been a dispute between you and Christie & Lowe, and that they wanted as much information as we could give them. I notified them that I knew nothing at all about any dispute between you and Christie & Lowe, but, if, as he stated, there was a dispute, I wanted to hear from your side before I took any part in the matter; that you were a large buyer of engines from us, and, naturally, our inclination was to side with you in any matter that we could properly do so.”
Neal in the execution of his mission to expedite the repairs visited defendant’s shop at Philadelphia, and later at Eddystone about three times a week, though an order was given that no one should be admitted without a pass and no pass was furnished to him.
It will be observed that Mr. Audenried in the letter last above quoted says:
“Mr. Christie had his engineer come up and he also brought in and introduced a man by the name of Lederle, who has been making it his business, to call us up on the telephone or come to see us pretty nearly every day since Mr. Christie was here. * * * As a result of the disagreeable attitude that Mr. Lederle has taken, on behalf of Christie & Lowe, I have refused to let his engineer come in our works.”
In a letter of April 15, 1907, addressed to Mr. Lederle, by the same writer, we find the following:
“I want to make it plain to you that we resent your insinuations and statements connecting us in any way with what you call a discreditable transaction. If your principals are dissatisfied with any deal or arrangement they made with Mr. Grünewald, at New Orleans, as I have told you before, that is a matter for them to take up directly with him, and, your apparent effort to throw back on us any responsibility for breach of contract or misstatements or any other claim that you think you may have on Mr. Grünewald have not, in any way, been calculated to urge us to incur any more expense in the matter of repairing this engine than we absolutely have to. I want to say, frankly, to you that, if I had known of the disagreeable, persistent, way in which I was to be followed in this matter, at a time when our factory here in Philadelphia is shut down and our Eddystone factory not operating fully, I would never have consented to have done anything at all to have helped Messrs. Christie & Lowe, as I was under no real obligation, in any way, to do what I voluntarily offered to do, without maldng a charge. This is the way I feel in the matter, and, while I will go along and do just what work I can, with the facilities I now have at hand at Eddystone, and get the engine out as quickly as possible I want to say that if this course is not satisfactory to you, please say so, now, and take the engine away.”
Notwithstanding what was thus written by him, at a time not suspicious, Mr. Audenried in giving his testimony, for the purposes of the defense in this suit seeks, apparently, to convey the impression that defendant was not advised that plaintiffs were in any particular hurry about the repairs of their engine, and that the order by which Neal was excluded or intended to be excluded from the works was merely a general regulation, the purpose of which was to prevent the men from being interrupted in their work by visitors who might engage them in conversation.
The engine in question was delivered to defendant, as has been stated, on May 21st, and the repairs were not completed until August 4th following — a period of 136 days. In its answer defendant gives the following as the reasons for the delay beyond that contemplated by its contract, to wit:
*227 “That plaintiff did not ship the engine promptly, as promised, and that it did not reach respondent’s -works until the 21st day of March, 1906 [meaning 1907], just two days before respondent shut down its plant at Philadelphia, and about one month before respondent resumed operations in its new plant at Eddystone.
“That, when it did so resume operations in its new plant at Eddystone, its plant and working force were in a more or less disorganized state, and great difficulties were encountered in manufacturing and replacing the broken parts of the engine, but that the said repairs were, made and said engine was returned with all possible dispatch.”
In the course of the trial defendant adduced some testimony to the effect that other causes besides the shutting down and removal of its plant' operated to delay the work on plaintiff’s engine, to wit: That certain castings, from which three new pistons were to be made, proved defective and others had to be substituted, and that, as there was some disturbance in labor conditions, the moulders and others who remained at work in other shops were poor mechanics and turned out poor work; that Neal ordered extra work which also caused delay; and that the repairs could not have been completed “within 10 days or anything like 10 days,” even under ordinary conditions.
It, however, appears that in December, 1906, defendant had erected a building at Eddystone, which is only 20 miles from Philadelphia, with a view to the removal of its plant to that place, and that the work of removal had already begun in January, 1907, a month or more before the date of the contract, whereby it assured plaintiffs that their engine would be repaired within about 10 days from the time of its receipt. Defendant was at that time (i. e., when the contract was made) in control of the situation, and could have retained in its Philadelphia shop the appliances required for the purposes of said contract. In fact, it remained in possession of the Philadelphia shop and paid rent therefor until the end of April, and Mr. Audenried testifies that it did so because there was some work that had to be done there. And, so far as we can see, the situation was about the same on March 21st, when plaintiffs’ engine was received, as defendant’s pleadings and evidence both show that the Philadelphia plant was not shut down until March 23d and the power was not started in the Eddystone plant until April 17th. Defendant’s pleadings also state, and: its evidence tends to show, that, after the removal of the plant to Eddystone and the-starting of the motive power, the establishment was in a state of demoralization for a month, but no other cause for the demoralization is assigned save that the plant had' been moved.
Bennington, one of defendant’s witnesses,, says:
“Very few of the machines in the shop were running until the early part of May, and even after that the whole place was completely demoralized, owing to the moving from Philadelphia.”
Celison, defendant’s superintendent, having testified that some time was lost by reason of the fact that certain castings intended to be used for the repairs in question proved to be defective, his cross-examination proceeds: as follows:
“Q. Did you have any new pistons cast?' A. Yes, sir.
“Q. How long would it take you to machine a piston? A. A piston of that description would take about three days.
“Q. When was it that you ordered the castings for the pistons, the casting of which became necessary after the discovery of the defect in the castings that you had. Can you refer to these papers and tell us (witness is-handed documents)? A. Yes. sir; I placed a requisition for four ‘J. J.’ pistons (that is the-pattern number) on the 9th of May.
“Q. Therefore,_ although you knew on February 18th that it would be necessary to have these three new pistons, although it took you only three days per piston to machine them, you waited until May 9th, or a period of 80-days, before you ordered the pistons. How do-you explain how you did that? A. The 80 days’ delay were caused by the following facts: That our plant was shut down in Philadelphia on March 23d, and we did not resume operations or start the motive power in Eddystone until April 17th. Furthermore, all the tools required to do that work had to be placed on foundations and had to be erected, set up, line *229 shaft connected and counter shaft connected, which was done in the greatest possible haste, by working day and night.”
There is no doubt that, save for certain work that Mr. Audenried said had to be finished, defendant shut down its plant in Philadelphia two days after it received plaintiffs’ engine; that is to say, the plant was shut down in the sense that work was stopped, and it may be conceded that for a month or more after the main engine had been sent to and the motive power started at, Eddystone the establishment there was in a state of demoralization, but we find nothing in the record to justify the conclusion that the shutting down of the plant on March 23d or the demoralization at Eddystone were matters beyond the control of the defendant, or that plaintiffs should be made to bear the consequences. If the plant could be kept open in Philadelphia for the purposes of work that defendant wanted or felt obliged to do, it might have been kept open for the purposes of the repairs that plaintiffs wanted, and had the right, under their contract, to have made. And if, rather than do that work in Philadelphia defendant chose to send the engine to Eddystone, where it knew, or should have known, that the repairs could not under any circumstances ’be begun for nearly a month, since the motive power was not started there until April 17th, and where, even then, the demoralization of defendant’s forces prevented its being done for two months longer that was a matter over which plaintiff's had no control, and for which they cannot be made to suffer. The fact that some of the castings were found to be defective is shown by defendant’s own witnesses to be a matter of common occurrence, the possible happening of which is always to be expected, and hence is always to be taken into account, and the attempt to show that the particular defects in question were caused by poor workmanship resulting in some way from labor troubles appears to us to be more guessing, "as an afterthought. Moreover, there is some testimony and there are some circumstances, - which, taken together, throw rather an unfavorable light upon the conduct of the defendant, to wit:
Neal testifies that he visited defendant’s shop in Philadelphia about half an hour after the engine arrived, and had a conversation with Audenried, the substance of which is given, in part, as follows:
“Q. What did Mr. Audenried say to you at that time? A. He said that he believed that he would send the engine to Eddystone; that it would take only a short time to repair her at the new factory, so that they could go ahead with the work.
“Q. Did he say anything before that, or did he say that ‘right off the reel’? A. Why, at first, he hesitated and said he did not know just what he would do, whether he would do the repairs in the shop, there in the old shop, or send it on to Eddystone.
“Q. Well, now, were you acquainted with the condition in which the shop then was? A. Yes, sir.
“Q. Prom your knowledge, as a machinist and mechanic, was it possible to have made and completed the repairs in the shop where the engine then was? (Objection.) A. Yes, sir.”
He then testifies that the engine was sent to Eddystone, and that he visited the shop there about three times a week, “trying to get them to complete the work and fix the engine.” And, further along his examination proceeds:
“Q. Now, from your knowledge of the conditions existing at their old plant and also the conditions existing at their new plant at Eddy-stone, supposing that they had done the work at the new plant at Eddystone, what was the greatest length of time that in your opinion would have been necessary to make the repairs that were required on that engine? (Objection.) A. About one month.
“Q. Were you familiar with the difficulties that they encountered, and do you include them in that estimate? A. Yes, sir.
“Q. How, then, do you account for the fact that they took about five or six months to do the work? A. Deliberate delay.
“Q. Why should they have had any desire to delay the delivery of the engine? A. They did not seem to want to complete or deliver the engine until they saw what action was going to be taken by Christie & Lowe.” *231 being asked “to what effect,” he again proceeds :
*229 Witness then says that he bases his testimony on statements made by Audenried, and,
*231 “A. To the effect that he did not know whether or not he would deliver the engine until he could get proper and satisfactory communication with either Mr. Grünewald or Christie & Lowe.
“Q. On what subject did Mr. Audenried want to communicate with Christie & Lowe or Mr. Grünewald, if he expressed a subject in his talk with you? A. In relation as to whether or not they were going to be held responsible for the difference between a 75 and 100 horse power engine belonging to Christie & Lowe.”
At still another place his testimony reads as follows:
“Q. What was the longest period of time, at which they did not do anything on that' engine? A. About four weeks.
“Q. How do you know that fact? A. By visiting the shop constantly at that time.”
The witness further testifies that at one time “Mr. Audenried stated that he did not believe that he would ship the engine until he got a settlement with Mr. Grünewald, if necessary,” but that “he changed his mind. On condition that the additional repairs that I had put on the engine were paid for in cash, he would release the engine.”
And the testimony so given is corroborated by a telegram from Grünewald to Audenried of date July 27, 1907, which reads:
“Am willing, ready and anxious to settle my account with you in full. You will make a grave mistake should you use that as an excuse to hold up Christie & Lowe’s property.”
Again, in Audenried’s letter, to Lederle, written on April 15, 1907, some time after the question of the horse power of the engine had been raised, it will be noted that he says:
“If your principals are dissatisfied with any deal or arrangement they made with Mr. Grünewald, * * * as I have told you before that is a matter for them to take up directly with him, and your apparent efforts to throw back on us any responsibility for breach of contract or misstatements or any other claim that you think you may have on Mr. Grünewald, have not, in any way, been calculated to urge ns to incur any more expense in the matter of repairing this engine than u>e absolutely have to. I want to say, frankly, to you that, if I had known of the disagreeable, persistent, way in which I was to be followed in this matter, at a time when our factory in Philadelphia is shut down and our Eddystone factory not operating fully, I would never have consented to bave done anything at all to have helped Messrs. Christie and Lowe, as I was under no real obligation, in any way, to do what I voluntarily offered to do, without making a charge. This is the way I feel in the matter, and, while I will go dlong_ and do just what worh I can with the facilities I now have at hand, at Eddystone, and get the engine out as quickly as possible,_ I want to say that, if this course is not satisfactory to you, please say so, now, and take the engine away.” (Italics by the present writer.)
Prom all of which, as, also from defendant’s rather harsh ultimatum that the engine should not be moved until its bill of $237 for the extra work ordered by Neal should have been paid, it looks very much as though defendant was actuated at one time by a desire to hold the engine and to hold off the repairs until it found out what action plaintiffs proposed to take in regard to the deficient horse power, and later on, when it seemed pretty certain that a claim would be made against it upon that subject, by mere resentment. It may be remarked, in conclusion, on this point that when it is considered that the value according to defendant’s figures of all the repairs made by it (save those ordered by Neal and paid for in cash) did not exceed $600, that the party called on to make them was the corporation by which the engine had been manufactured less than a year before, and that it had agreed to make them in about 10 days, the defense that they could not for the reasons assigned make them in less than four months appears to us to be trivial and disingenuous, for no concern could do business in that way, and survive. There is testimony to the effect that some delay was caused by the extra work ordered by Neal, and, though we have doubts upon the subject, nevertheless, as the testimony to the contrary is not very definite, we shall resolve the doubts in favor of defendant, and make an allowance of time on that account. We think it is shown with *233 sufficient certainty that the difference between the value of the 75 horse power engine which was delivered and the 100 horse power engine which plaintiffs ordered and paid for was $1,500. As to plaintiffs’ claim for $1,000 as the expense to which they would be put in taking the 75 horse power engine out of their boat and replacing it with an engine such as they • contracted for, their counsel says in his brief:
“We will not discuss this item further, as there is nothing in the record as proof to sustain it.”
From which we conclude that the claim is abandoned. Concerning the damages sustained by reason of the delay in making the repairs, plaintiffs by their supplemental petition (filed in consequence of the ruling of the trial court, maintaining an exception of “vagueness,” with leave to amend) allege that they were damaged to the extent of $6,000 by the deprivation of the use of the boat during the period alleged, or say $50 a day for 120 days.
It is abundantly shown that they were much in need of the boat (in fact, it can hardly be supposed that they would have expended $20,000 in its construction if they had not been), and that they did everything possible to induce defendant to recognize that need, and act accordingly.
Making a liberal allowance, because the contract called for the completion of the repairs in “about” 10 days, and because of -delay said to have been caused by extra work ordered by Neal — in other words, allowing 36 days, instead of 10 for the repairs — and there still remain 100 days during which, through defendant’s fault, plaintiffs suffered the deprivation complained of, thereby losing the use of property worth $20,000 and being subjected to the inconvenience, expense, and detriment to their business consequent upon such deprivation.
Mr. Christie, being asked for what purpose the boat was to be used, answered:
“For conveying the members of the firm and ,our representatives to and from the different points of our work, which covered a distance of nearly 700 miles on the Mississippi river, and for whatever use, like the conveying of supplies and material, such as the boat was capable of carrying. It was built as an adjunct, and a very necessary one, in the carrying out of our contract."
Mr. Lowe, in his testimony, says:
“We were needing the boat. We were carrying out a contract with the United States government, on which we were under heavy bond to fulfill our contract according to time, and we simply had to do it. We needed this boat, and needed it all the time for carrying out that work. It was not a question that involved $2,000 or $3,000, but it involved hundreds of thousands of dollars and our professional reputation. We had all our resources and our personal energy pledged to the fulfillment of that contract, and we had to go ahead with it,” etc.
He further testifies, in substance, that while the boat was delayed, he had constant occasion to go back and forth between New Orleans and the jetties; and, being asked how he went, he replied:
“Sometimes on our own tugs, and sometimes on the government tugs, and sometimes took the train and went on the mail boat to Buras, and sometimes took the train and chartered- a sail (boat) to Buras, and sometimes I would go down on the government boat or one of our own, take a tug off the work and go to Buras and take a train, and sometimes all the way up here. * * * I could not always go and come whenever I ought. Sometimes there would be lapses of a week when I would have no way of going down at all. I could not spend three or four days to go, and so I could not leave here. *' * *
“Q. Did the business' suffer as a result of the not having the use of the boat? A. Yes, sir; it did. There was nothing here. We had nothing to replace it with. Our boats were all engaged and had work to do, and we could not get a boat that was safe and suitable to go up and down the river as well as we could with the De Soto. That boat was built especially for the purpose of going up and down this river. It was built strong, with a heavy hull, was able to operate on the river under all sorts of conditions, storms, and seas, and floating drift, and everything of that kind, and there was no other boat outside of her — no tug in the harbor —that could take her place. A steamboat was not safe.”
The testimony (of the witnesses mentioned and others), taken all together, shows that no boat approaching the De Soto in efficien *235 cy could have been chartered, if at all, for less than $50 a day, and that it might well have cost $75 or $100 a day, or even $10 an hour, as the charter was for a longer or shorter period, or as the demand was greater or less than the supply at the moment. At those prices, however, the owner maintained and operated the boat, and we conclude that the mere rental value of the De Soto may be conservatively fixed at $20 a day, to which we think the recovery on account of the item under consideration must be confined. So that assuming the law to be in their favor plaintiffs should be allowed to recover $3,500, with legal interest from judicial demand.
Opinion.
As appears from the foregoing statement, plaintiffs, who knew nothing of Grünewald, wrote to defendant at Philadelphia, with a view to the purchase of one of the engines of which defendant held itself out to be the manufacturer, and they received the following reply:
“We have your favor of December 20th in which you request us to give you quotation on a gasoline marine engine for use in a yacht that you are now building, but, if you will refer to the copy of your letter, you will see ■ that you have not stated what size engine you will require. We have, therefore, referred the matter to our representative, Mr. Theodore Grünewald, of your city, and have asked him to take the matter up direct with you and give you full particulars. Trusting that we may he favored with your valued order, through ou/r representative, in the near future, we beg to remain very truly yours.” (The italics are ours.)
It will be observed that in the letter thus quoted defendant gives no intimation that it is not doing business in New Orleans, or that its engines are sold here only by Grünewald, and for his own account. To the contrary, it assigns as its reason for referring plaintiffs to Grünewald, and apparently as its sole reason, the fact that plaintiff had failed to mention the size, of the engine that they wanted, and by reasonable inference that, as it (defendant) had a representative on the spot who could furnish full particulars, it would be more convenient for all parties that plaintiff should take the matter up with such representative. The business that plaintiffs wished to transact was the purchase of an engine which defendant was engaged in manufacturing and selling, and when, in reply to their tentative proposition to transact that business with defendant, it (defendant) referred them to Grünewald as its representative, such reference meant to the common understanding that for the purposes of that business Grünewald was authorized to represent, and would represent, the defendant. When defendant assured plaintiffs that Grünewald, its representative, would give them full particulars, the assurance to the common understanding and in common honesty meant that the particulars to be given by Grünewald were authorized by, and would bind, defendant, and, when it concluded its letter by saying, “Trusting that we may be favored with your valued order, through our representative,” it meant that the “valued order,” when given to its representative, would be given to defendant.
We, however, pretermit the questions of the exact scope as between defendant and Grünewald of the latter’s authority, and of the estoppel as against defendant, growing out of its letters to plaintiffs and to Grünewald, whereby Grünewald was designated as the representative of the defendant for the purposes of the business to be transacted; for defendant’s president, as we have heretofore stated, specifically admits, and Grünewald testifies that he so understood, that he (Grünewald) was authorized by defendant in selling its engines to guarantee the brake horse power at which they were rated and to guarantee the engines for one year against imperfect workmanship and defective material. In other words, for the purposes of any representations made by him upon the points mentioned, which were predicated upon information given by defendant, Grünewald is admitted to have been authorized to *237 ■speak for and bind defendant, and this suit is based upon a breach of such representations and of the contract for repairs made •directly with the defendant. It is true that Grünewald did not in signing the contract for the sale of the engine here in question add to his signature the words “Representative of the Pennsylvania Iron Works Co.,” but plaintiffs had in their possession defendant’s written assurance that he would act in that capacity, and Grünewald, apart from his admitted authority so to do in all cases, had defendant’s written instructions to represent it in this particular case, and, as both plaintiffs and Grünewald acted upon and under that assurance and those instructions, they must be considered as forming part of the contract into which they entered and as making defendant a party thereto.
If plaintiffs had never heard of defendant and had bought the engine, as it did, and had subsequently learned that for the purposes ■of his representations as to the horse power, material, and workmanship Grünewald was representing defendant, as his undisclosed principal, they (plaintiffs) would have had their recourse on defendant as the real party to the contract, and they are certainly no worse off because defendant informed them in advance that it was Grunewald’s principal.
The question, then, is: Were the representations made by Grünewald as to the horse power and the material and workmanship, of the engine authorized ^by the information furnished him by defendant?
That the representations as to the material and workmanship were so authorized is admitted by the answer of the defendant, ■and by its act in agreeing to make those representations good without charge as part of the obligation imposed upon it by the sale of the engine. Moreover, the contract for the repair of the engine having been made directly with defendant, Grünewald was thereby eliminated. That the representations as to the horse power of the engine were so authorized is demonstrated by the evidence, and is, in effect, also admitted by defendant’s president in his testimony.
It will be remembered that on January 20, 190G, Grünewald sold to McMahon an engine of 100 horse power, and there is no denial of the fact that he was authorized by defendant to represent it as of that capacity. On 3 anuary 23d, defendant wrote a letter acknowledging the receipt of the telegram, advising it of the sale, and saying:
“We have entered the order and can make shipment in March as you request. This engine will be fitted with the new vaporizer and multiple feed oilers and we propose to balance the cranks to help vibration. I think also it will be well to cut down the compression somewhat, which would reduce the power, but will wait to get your instructions on this point. We have almost made up our minds to do this and rate the engine at 75 H. P., although not change the price.”
As Grünewald had sold to McMahon an engine of 100 horse power, he does not appear to have considered, favorably, or at all, the suggestion that he should attempt to comply with his contract by delivering a 75 horse power engine at the same price, and, as he gave no instructions on that subject, defendant went on with the building of the engine, and on April 4, 1906, shipped it as “J. J. 100 H. P. engine No. 2,663.” On May 4th following Grünewald, with McMahon’s consent, sold the engine (No. 2,663) to plaintiffs, and advised defendant of the sale by a letter of even date therewith, in which he wrote:
“McMahon’s 100 H. P., J. J. engine has been sold to Messrs. Ohristie & Lowe, he, kindly consenting.”
To which defendant on May 9th replied:
“We no.te that the 100 H. P. engine, shipped for Wm. McMahon has been sold to Messrs. Christie and Lowe and will make this notation on our records.”
Thereafter, and until after March 13,1907, when Neal learned that the engine was of but 75 horse power, defendant repeatedly re *239 ferred to it as of 100 horse power, and it was only after Neal’s discovery became known that it ever referred to the engine as otf 75 horse power. It is admitted that defendant’s letter of February 1, 1906, did not refer to the McMahon engine, and the proposition that’ by the suggestion contained in the letter of January 23d as to the reduction of the horse power (while maintaining the price) of an engine that had already been sold, coupled with the assurance .that defendant would wait for Grunewald’s instructions, Grünewald should be held to have known that the horse power was reduced, though he gave no such instructions, and though defendant thereafter shipped the engine and wrote of it as of 100 horse power, is wholly untenable.
The evidence authorizes the conclusion that defendant knew the brake horse power of the engine in question at the date of the sale to plaintiffs, and that plaintiffs did not know of it until after March 13, 1907, within the year prior to the bringing of this suit. There is therefore no basis for the plea of the prescription of one year. Civ. Code, arts. 2534, 2546.
The Code provides that in the redhibitory action the buyer may limit his demand to a reduction of the price, though, where the seller knows of the vice of the thing sold, and omits to' declare it, he may be held for damages.' Civ. Code, arts. 2541, 2545. As we have heretofore found, the difference between the value of the engine bought and paid for by plaintiffs and that delivered to them is reasonably $1,500.
The claim for damages resulting from the delay in repairing the engine is predicated on the contract between plaintiffs and defendant of February 18, 1907, though the consideration of that contract as to defendant is to be found in the obligation of guaranty assumed by it through its representative, Grünewald, in the sale of May 4, 1906. There can be no doubt that the loss of the use of the boat during the time that the engine was being repaired was an element of possible damage which was in the contemplation of the parties when the contract for repairs was made, and that defendant was advised of the importance of completing the repairs within the time stipulated is abundantly proved.
It is therefore unnecessary to decide whether defendant acted in bad faith in the matter or not. We are, however, of opinion that its excuses for the delay in making the repairs are in the main frivolous and disingenuous. The attachment, we think, was properly dismissed, not because the action is ex delicto, for one is not deprived of his right of action, ex contractu, merely because he alleges that the contract had been violated in fraud; but (as heretofore stated, in another case) “because an attachment will not lie where the debt is unliquidated, and from the nature of the claim asserted it is evident that any amount that may be fixed upon must be conjectural, and hence ought not to serve as the basis of a positive oath.”
E. Sondheimer Co. v. Richland Lumber Co., 121 La. 795, 46 South. 806 (and authorities there cited).
It is therefore ordered, adjudged, and decreed that, in so far as it sets aside the attachment herein issued, the judgment appealed from be affirmed, and that in all other respects said judgment be annulled, avoided, and reversed. It is further adjudged and decreed that there now be judgment in favor of plaintiffs Christie & Lowe, and against defendant, Pennsylvania Iron Works Company in the sum of $3,500, with legal interest thereon from judicial demand, together with all costs save those incurred by reason of the issuance of the writ of attachment and of the proceedings thereunder.