ODOM, J.
 

 Defendant shot and killed her husband and was indicted for murder. Upon trial she was convicted of murder without capital punishment and sentenced to life imprisonment at hard labor. She appealed from the verdict and sentenpe.
 

 The errors complained of are set out in eight bills of exception, which we dispose of in the order presented.
 

 1. While a prospective juror was being examined on his voir dire, he was asked by counsel for defendant if he had any prejudice against the law of self-defense. The question was objected to by the state on the ground that the juror was not supposed to know the law of self-defense, as he had not then received instructions on the law by the trial judge. The objection was sustained, and counsel for defendant, conceding that the ruling was correct, then propounded to the juror the following question:
 

 “Have you any prejudice against the law of self defense, and I couple with the question a request that the court explain the law of self defense to the juror.”
 

 The court refused to explain the law at that time, for the reasons that the prospective juror had already stated, and at the time said he would follow the law as given him in charge by the court, and that he would do that whether he approved the law or not, or whether or not he thought the court correctly stated the law, and for the further reason that the proper time for the court to explain the law to the jurors is in his charge to be given after the ease is argued and submitted. Counsel for defendant excepted to the ruling of the court and reserved a bill.
 

 The ruling of the court is correct. The answer of the juror to the questions propounded to him shows that he understood that it was his duty to take the law as expounded by the judge. He said he would do that. That was all defendant had a right to expect and demand. It is not the duty of the trial judge to go into detail and explain to a prospective juror who is being examined on his voir dire all of the different phases of the law which may be applicable to the case on trial. The time for him to do that is after the testimony is closed, and the case is argued and submitted by the state and the accused. This identical question was before the court in the case of State v. Sinigal et al., 138 La. 469, 70 So. 478, where it was held, to quote paragraph 3 of the syllabus written by the court:
 

 “A request on behalf of defendant that the judge charge the juror, who is under examination on his voir dire, as to the law of self-defense, was properly refused; the charge should be made after the ease has been tried, and the arguments heard.”
 

 2. Bill No. 2 was reserved to the ruling of the court permitting the prosecuting attorney to a,sk a witness called by him on behalf of the-state the following questions:
 

 “Isn’t it a fact that you testified before the grand jury concerning certain statements
 
 *126
 
 that Alzada Brown made about the shooting after you got in the house?” and “Now, for the purpose of refreshing your memory, •Mr. McNeal, didn’t you testify before the coroner’s jury that ‘I came immediately through my house to the street and back to Jim Brown’s house’?”
 

 Counsel for defendant objected to these questions on the ground that the state was attempting to impeach its own witness without pleading surprise.
 

 Article 487 of the Code of Criminal Procedure reads as follows:
 

 “No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.”
 

 This is but a restatement of the rule laid down by all text-writers and consistently adhered to by this court. But the state was not attempting to impeach its own witness. The trial judge in his per curiam to this bill said: “Counsel for the state was merely trying to refresh the witness’s memory about the subject matter of the examination.” This is made evident by the questions themselves. The witness answered that he had given no such testimony, and no witnesses were called to contradict him.
 

 In the case of State v. Nash, 169 La. 947, 126 So. 434, 435, after referring to article 487 of the Code of Criminal Procedure, the court said:
 

 “It is also well settled that, where a party is bona fide surprised at the unexpected testimony of the witness whom he has voluntarily called, he may be'permitted to interrogate him as to his previous declarations inconsistent with the testimony given, the object being to test the witness’ recollection,' and lead him, if mistaken,' to review whát he has said. To ask a witness a question for the purpose of refreshing his .memory is not to impeach him.” — citing. Marr’s Criminal Jurisprudence, vol. 2; page 991, § 648, paragraph 3.
 

 The court’s ruling was correct.
 

 3-7. We consider these bills together, as they pertain to the exclusion by the trial court of certain testimony sought to be introduced by defendant.
 

 The defendant was charged with murder and pleaded self-defense, and, in the alternative, that the crime, if any had been committed, was manslaughter and not murder. She sought to introduce evidence of the dangerous character of the deceased, and that prior to the fatal shooting he had made" threats against her. This testimony was excluded by the court for the reason that in his opinion there had been no proof of a. hostile demonstration or overt act on the part of t-he deceased.
 

 Article 482 of the Code of Criminal Procedure reads as follows:
 

 “In the absence of proof of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible.”
 

 The settled jurisprudence of this state is that, in a prosecution for murder, evidence of the dangerous character of the deceased and of prior threats by him against the accused is inadmissible until and unless an overt act or hostile demonstration by him toward accused has been proved to the satisfaction of the trial judge. State v. Dreher, 166 La. 924, 118 So. 85; State v. Harvey, 159 La. 674, 106 So. 28; State v. Poole, 156 La. 434, 100 So. 613; State v. Benoit, 144 La. 276, 80 So. 329; State v. Boudreaux, 137
 
 *128
 
 La. 227, 68 So. 422; State v. Varnado, 131 La. 952, 60 So. 627.
 

 And while this is true, it is also well settled that, if a trial judge, after hearing the testimony offered in support of the accused’s contention that deceased was guilty of hostile demonstrations or an overt act, decides that no overt act was committed, his ruling on that question is subject to review by this court on appeal. State v. Dreher, State v. Harvey, State v. Poole, State v. Benoit, supra, - and State v. Clark, 142 La. 282, 76 So. 714.
 

 The testimony relied upon by counsel for accused in support of her contention that deceased was guilty of hostile demonstrations toward her and of an overt act was attached to these bills of exception and is before us for review.
 

 The only testimony brought up which tends to establish the overt act is that of Will Wright, L. W. Cooper, Eva Lewis, and the defendant, Alzada Brown. The testimony of Will Wright is to the effect that defendant told him after the shooting that she killed her husband because he kicked her. L. W. Cooper, a deputy sheriff, testified that accused told him after she was. arrested that deceased was drunk and went into the kitchen where she was and, kicked her; that he crossed the room and went back to get a gun; that the gun had been removed by her and was in another room, “and that while Jim (the deceased) was hunting the gun she got it”; that she had moved the gun from the back room and put it into a washstand drawer in the froot room, but that her husband did not know that. Neither of these witnesses knew anything except what the accused told them.
 

 Eva Lewis testified that she lived near the house where deceased was killed, and that just before the shooting occurred she saw deceased dressed only in his underclothing standing in the back door, and that a few moments later she saw defendant pass by with an oil can and some packages in her hand; that she went into the house and soon thereafter heard deceased cursing and say to defendant, “You don’t look like you want to get out. I mean for you to leave on this afternoon’s train”; that she heard defendant say, “Don’t kick me. You hurt me. I haven’t did anything to you” ; that she then heard a little rumbling, after which deceased cursed defendant and said, “No, I am going to kill you, I have got it in for you anyhow.”
 

 Witness said that she then went into her house, got a broom and began to clean up the back yard when she heard two shots and the accused say, “I told you to stop,” and then heard three other shots.
 

 The defendant testified that when she got back from the store her husband was lying down in the back bedroom; that she began to prepare a lunch for him to carry in his basket (he worked at night as a fireman at. a sawmill), and that he came to the kitchen where she was and said, “I told you, by God, I mean for you to get away from here,” and kicked her while she was stooping over; that he then looked for a stick with which to hit her, saying, “I told you I mean for you to get off on the train. You look like you don’t want to go and I mean to make you go”; that she rushed into'the front bedroom, deceased following; that he went to the armoire, opened the door, and “scratched up on the different shelves, all the time swearing and said, “I can’t get rid of you no other way and, by God, I will kill you”; that he went into the back bedroom, and turned up the mattress looking for a gun. She was asked, “Where were you?.
 
 *130
 
 What were you doing all that time?” She said, “I was inside that bedroom by the washstand. I was following him trying to coax him.” She said she got the gun from the washstand drawer which was in >the front room “when he made a dash into that back bedroom”; that gftgr he failed to find the gun “he made a dash at me and I shot.”
 

 An overt act is a hostile demonstration of such character as to create in the mind of a reasonable person the belief that he is in immediate danger of losing his life or of suffering great bodily harm. The term “overt act,” as used in connection with prosecutions for murder where the plea of self-defense is involved, means any act of the deceased which manifests to the mind of a reasonable person a present intention on his part to kill defendant or do him great bodily harm.
 

 In the case of State v. Williams, 46 La. Ann. 709, 15 So. 82, 83, the court said:
 

 “In order to constitute the overt act that would justify the taking of human life, there must be some demonstration made by the deceased against the accused of such character as to impress upon him that he was in imminent danger of his life or some great bodily harm.” State v. Stewart, 47 La. Ann. 410, 16 So. 945; State v. Fontenot, 50 La. Ann. 537, 23 So. 634, 69 Am. St. Rep. 455.
 

 Referring now to the .testimony attached to these bills of exception on which defendant relies to establish the overt act, we find that there is none in fapt, except that of the accused. Eva Lewis testified that she heard exclamations by both the deceased and the accused a few minutes prior to the shooting, the accused saying, “Don’t kick me. .You hurt me,” the deceased saying, “No, I am going to kill you. I have got it in for you anyhow.”
 

 This witness was not present when accused shot deceased, and saw nothing. She did not know of her own knowledge whether deceased kicked defendant or what he did thereafter.
 

 But if it be true that deceased did kick defendant, as she said he did, that was not an overt act in law under the circumstances. It can hardly be said that such an act as detailed by accused was sufficient to create in her mind the belief that deceased intended to take her life or do her any serious bodily harm. He was bare-footed, Eva Lewis ' said, and, according to defendant’s testimony, kicked her on the buttocks or thigh. Dr. .Turner, the coroner, examined her and found no sign whatever of any injury. Some of the witnesses whose testimony is in the record said she limped at times immediately following the shooting and at other times she walked without limping. This testimony very naturally created a doubt in the mind of the trial judge whether she had in fact been kicked.
 

 Not only that, the deceased kicked her, if at all, not at or about -the moment she fired the fatal shot, but several moments before. Deceased, so the accused says, withdrew from the place' where he kicked her and went into another room and later through three doors, according to Cooper, into the back bedroom, where he was killed. Conceding that the assault described'by defendant was such as to create in her mind the belief that she was then in danger, the withdrawal of deceased from the scene was such an act as to remove such apprehension for the moment. To constitute an overt act in law in cases of this kind, the assault or demonstration made by the person slain against an accused must be such as to create reasonable apprehension of danger in the mind of the accused at the time the fatal
 
 *132
 
 assault is committed. One is not excusable for taking human life except under circumstances which create in his mind a reasonable belief that he is at the moment in danger of great bodily harm or of losing his life, and that to kill the assailant is the only apparently safe means of saving himself.
 

 Referring now to the testimony of accused, w'e do not think it constitutes proof of an overt act by. deceased. The sum and substance of her testimony is that she killed her husband because he was searching for a pistol with which to shoot her, and that she believed he would do so. But she knew he would not find the pistol, for she herself had removed it from the place where he was looking, and, at the time he was searching for it, she had it in her own hand. She was therefore necessarily under no apprehension that he would shoot her, and she does not say that his conduct at that time indicated that he would assault her otherwise than- by shooting. She says he was asking her where the gun was and was searching for it.
 

 Deceased searched for'the gun first in the front room, while defendant was present. Railing to find it there he left the room and passed through two other rooms into the back bedroom. As he left the front room where defendant was, she extracted the only pistol on the premises from the drawer of the washstand and immediately followed deceased through two other rooms into the back room, where she shot him, carrying the gun along with her as she went. She says her purpose in following him was to “coax him.” The trial judge did not believe that was her purpose, and neither do we. He believed, and so do we, that she followed him to do just what- she did, to kill him.
 

 Will Wright, who saw accused immediately'after the homicide, "heard her say, “If a man or woman kicks me, I will kill them.” She told Dr. Turner, the coroner, that she shot deceased while “he was1 at the foot of the bed, stooping over looking- for the gun,” which, as we have already stated, she knew he would not find.
 

 The testimony brought up shows that at the time accused got the pistol she was in the front room, and that she could have left the house in perfect safety by passing through the front door. It was her duty to do that under the law, but instead she followed him to the place where she shot him.
 

 The trial judge in his per curiam to these bills reviewed all the testimony touching the question whether an overt act was committed by deceased, and we quote that portion of it in which he gives his reasons for holdr ing that no overt act was committed.
 

 Per curiam of trial judge:
 

 “Evidence of prior difficulties and previous threats was excluded because the physical evidence in this case, as well as the testimony of the witnesses, showed that the deceased was shot in the -back by the defendant, who, armed with a pistol, had followed him up. Shortly after the killing the defendant told Sheriff Cain, Dr. Turner and deputies Brown and Cooper that the deceased had kicked her, and that she armed herself with a pistol and followed the deceased into a back bedroom, and there shot him in the back; that the deceased reeled oh' the bed, and she there shot him again. This was admitted by the defendant and testified to by the officers. In telling the story of the killing to the officers, the defendant did not use the exact words I have used, but she showed where the deceased was standing on one side of the room when he was shot, and showed where she was standing- on the opposite side of the room, in the door, when she fired the
 
 *134
 
 .shot, she stating that the deceased was lying with his back to her when she shot him.
 

 “The deceased was shot twice. The physical facts and the testimony clearly show that the first shot struck the deceased in the back, went through his body, coming out of his chest, went through the west wall of the room, and through both sides of a trunk that was against the wall. This wound went almost straight through the body of the deceased, the point of entrance and the point of exit of the bullet being almost on a level. The hole in the wall, caused by one of the ■bullets fired, was exactly the same distance from the floor as was the wound of exit in the breast of the deceased.
 

 “The evidence showed that this wound was not necessarily fatal, and in no event could it have been immediately fatal.
 

 “The deceased was also shot in the back again, the bullet entering somewhere below the left shoulder and ranging upward, coming out.above the left collar bone, not very far from the neck. This wound, according to expert testimony, was necessarily and immediately fatal.
 

 “The physical facts showed that the deceased’ was lying on the bed when he was shot in the back the second time, for there was a small blood stain immediately under the wound near the left side of his neck, and there was a hole in the mattress directly opposite this exit wound,’ and a hole in the bottom of the mattress, and in the wall of the room, all in line, showing that the deceased was lying in the bed when the shot was fired, and showing that the person firing the shot stood in or near the east door of the bedroom.
 

 “Two other shots were evidently fired at the deceased as he was lying in the bed, for this is shown by the course of the two other bullets, which went through * the- , mattress near where the deceased, was lying, and struck the west wall of the bedroom.
 

 “The defendant told Jess Brown, a deputy sheriff, that she shot the deceased because he kicked her.
 

 “Will Wright, immediately 'after the shooting, walked up to the Brown home, and was invited in by the defendant, who told him ‘if a man or woman kicks me, I kill him.’ Later the defendant asked some bystander if the deceased was moving, and if he was, using an oath, she would shoot him again.
 

 “The defendant asked Rev. McNeil if her husband Jim Brown, was dead, and requested the preacher to stand him up and see if he could walk.
 

 “To J. E. Cross the defendant made the request to see if her husband was moving, and said if he was, she would shoot him again.
 

 “The defendant admitted that she told the officers, Sheriff Cain, deputies Brown and Cooper, and the Assistant District Attorney that she shot the deceased while he was leaning over near the foot of the bed, and from the position of herself and the deceased at the time .of the shooting, she indicated that he was shot in the back.
 

 “When the defendant was on the stand, she testified that after she first shot her husband in the back, making the wound which was not necessarily fatal, .and in no case immediately fatal, her husband, ‘leane.d on the foot of the bed a while,’ and that thereafter, she shot him again.
 

 “The defendant’s testimony ■ was false in so many particulars, being contradicted not only by the physical facts in the case, but by /the evidence of reliable witnesses that her uncorroborated testimony is entitled to ■ little or no weight. For example, she denied
 
 *136
 
 having shot her husband while he was lying on the bed, and the bullet holes in the top and bottom of the mattress, and the blood trickling from the wound when the fatal shot was fired, showed that the body was lying in exactly the same position when it was found by the witnesses, that it was when the fatal wound was made.
 

 “The fatal shot, as indicated above, entered just a little below the left shoulder, ranged almost straight up, a course the bullet could not have taken had the deceased been standing up and the defendant in the position she said she was in when the shot was fired. The 'two other shots that went through the mattress indicated that the defendant was shooting at her husband while he was lying on the bed. All of these circumstances show clearly, beyond any question of a doubt, that the deceased was lying on the bed when he received the fatal wound in the back.
 

 “In testifying, the defendant said that the deceased rushed at her, and, she shot him. Her testimony is contradicted by the fact that she had told Fannie Johnson to look at her husband and see if he was moving, and that if he was moving she would shoot him again. As we have seen, she was contradicted on this point by Fannie Johnson.
 

 “The defendant told all of the officers previously mentioned that Brown was at the foot of the bed looking for a gun when she shot him, and on the trial of the case she denied making this statement to the officers, hut said that Brown was at the head of the bed at the time mentioned. .She denied asking-J. E. Cross to see if her husband was moving, saying she would shoot him again if he was,- thus being .contradicted by J. E. Cross on a material point.
 

 “When people- began to go to the Brown house after the killing, the defendant told them about her husband kicking her, and she would hold her thighs and limp as she walked. Evidently forgetting to limp, or being so slightly kicked as not to cause her to limp, the defendant would limp a while, and then walk perfectly naturally.
 

 “Some two or three hours after the killing the coroner made a very careful and thorough examination of the defendant and stated that there was absolutely no evidence on her body of any kicks, blows or bruises.
 

 “The defendant’s murderous intent was shown by the fact that she shot her husband in the back, inflicting the fatal wound, while he was lying down, and by the fact that she inflicted the fatal wound some minutes after he was lying down in the bed, or that she shot at him some minutes after she had previously shot at him on the bed. Rev. McNeil testified that he heard several shots, and then, some minutes afterwards, and after he had walked a considerable distance, heard the last shot. To the same effect was the testimony of Mary Wilson, who lived just across the street from the defendant; Elita Wilson, who lived in the defendant’s back yard; and of Estelle Estridge,. who lived about two doors from the defendant’s house.
 

 “In this case it is not claimed that the deceased or the defendant had more than the one gun with which the shooting was done. It was the defendant’s contention that the deceased had kicked her, and then went to get the gun with which to shoot her, and that she shot the deceased while he was looking under the head of the bed, at the place where they usually kept the gun, although the defendant admitted that she had moved the gun from the place where it was usually kept, and the deceased did not know of its removal, and hence, the place to which it had been moved. She testified that she went to the place where she had put the gun, in another room, and got the gun, followed the deceased through the
 
 *138
 
 house into the back room and there she shot him in the back.
 

 “In taking of the testimony outside of the presence of the jury, in laying a foundation for the admission of prior threats and difficulties, it was established that once before the defendant had shot the deceased in the back.
 

 “From all sides, and in addition, the manner and demeanor of the defendant herself on the witness stand I am convinced that no overt act or hostile demonstration had been made by the deceased against the defendant.
 

 “It will be remembered, as I have pointed out above, that evidence of the alleged pri- or difficulty and threats immediately preceding the difficulty, and as sought to be shown in the testimony taken in this Bill of Exception, went to the jury.”
 

 We make no special reference to bills No. 4, 5, and 6, for the reason that they relate to matters already discussed. Bill No. 8 seems to have been abandoned, as it was not referred to by counsel either in oral argument or in brief.
 

 For the reasons assigned, it is ordered and decreed that the verdict and judgment appealed from be affirmed.
 

 O’NIELL, C. J., dissents from the ruling on bills 3-7.