ST. PAUL, J.
 

 The defendant was charged with the murder of one Elmer Duinnington, and was convicted of manslaughter. 1-Iis appeal brings-up two bills of exception; of which, one is-an application for á new trial, based solely on the alleged insufficiency of the evidence-to convict, and therefore presenting nothing for our consideration; the other being a bill-reserved to the refusal of the trial judge to-admit evidence of the alleged dangerous character of the deceased.
 

 I.
 

 “The settled jurisprudence of' this state is. that, in a prosecution for murder, evidence of the dangerous character of the deceased and of prior threats by him against the accused is inadmissible until and unless an overt act or hostile demonstration by him toward accused has been proved to the satisfaction of the trial judge.” State v. Brown, 172 La. 121, 133 So. 383, 385; citing, State v. Dreher, 166 La. 924, 118 So. 85; State v. Harvey, 159 La. 674, 106 So. 28; State v. Poole, 156 La. 434, 100 So. 613; State v. Benoit, 144 La. 276, 80 So. 329; State v. Boudreaux, 137 La. 227, 68 So. 422; State v.. Varnado, 131 La. 952, 60 So. 627.
 

 This rule has now been made
 
 statutory-..
 
 The Code - of Criminal Procedure (Act No.
 
 2-
 
 of 1928) provides:
 

 “Art.' 482. In the absence of
 
 proof
 
 of hostile demonstration or of overt act on the part of the person slain or injured,
 
 evidence
 
 of his-dangerous character or of his threats against accused is not admissible.” (Italics ours.)
 

 And: “Mere
 
 evidence
 
 of such threats [hostile demonstration] as distinguished from.
 
 *875
 

 proof
 
 thereof, is insufficient.” State v. Sandiford, 149 La. 934, 99 So. 261, 267; State v. Poole, 156 La. 434, 100 So. 613.
 

 However, “it is also well settled that, if a trial judge, after hearing the testimony-offered in support of the accused’s contention that deceased Was guilty of hostile demonstrations or an overt act, decides that no overt act was committed, his ruling on that question is subject to review by this court on appeal.” State v. Brown, 172 La. 121, 133 So. 383, 385; citing State v. Dreher, 166 La. 924, 118 So. 85; State v. Harvey, 159 La. 674, 106 So. 28; State v. Poole, 156 La. 434, 100 So. 613; State v. Benoit, 144 La. 276, 80 So. 329; and State v. Clark, 142 La. 282, 76 So. 714.
 

 II.
 

 The recital of this homicide is a long one, because the witnesses were many; but the
 
 ‘‘action"
 
 of the tragedy itself was as sudden, short, and bloody as its origin was trivial; for not
 
 one
 
 life only but
 
 tioo
 
 were snuffed out in a moment (“two seconds,” says one witness), after a brief
 
 argument
 
 as “silly” and unprofitable as a debate about the number of the fixed stars — whether odd or even?
 

 It was the night before the election, a primary election for a high state office; wherein X and Y were candidates. The accused and his uncle, one Milton (Red) Bates, were supporters of X; and the deceased, Elmer Dunnington, was supporting candidate
 

 Y. But the
 
 merits
 
 of the election itself were not involved in the
 
 argument;
 
 there was no discussion about the issues of the campaign; nor were the
 
 qualifications
 
 of the candidates in dispute at all. The only matter about which there was any difference and controversy tvas simply — whether Bates had a man, a supporter of X, to wit, this accused, who could “whip”
 
 any
 
 supporter of candidate Y. But neither Bates nor Dunnington, the principals in the brief
 
 argument
 
 which ended so disastrously, wall ever know who -was right and who was wrong on
 
 that
 
 score; for both have now gone where such matters are only of minor importance, if of importance at all.
 

 III.
 

 This homicide occurred some time after 10:30 that night. Shortly before it, Bridges, the accused, had been fighting with one Wiggins(?), the details whereof are neither given nor material. But Bridges seems to have been the victor, for he came away from the scene of the scuffle shouting “Hooray for X”; to which Dunnington answered, “Hooray for Y.” This seems to have irritated Bridges, for he then tried to “get Elmer,” but was “grabbed” and taken away by his uncle, Bates; who would not allow him to follow Dunnington as he withdrew into a nearby restaurant, where he had coffee.
 

 Dunnington, after having his coffee, left the restaurant, but remained outside. Twenty minutes later Bates and Bridges came to the restaurant, where they also had coffee; and where Bates endeavored to place a bet on the result of the election, but was unsuccessful. Bates and Bridges then left the restaurant; but, instead of going towards their own parked car, they went in the
 
 opposite
 
 direction, towards Dunnington, who was still standing-near the entrance to the restaurant.
 

 It was then, on approaching Dunnington,
 
 after
 
 having previously stopped his nephew’s attempt to follow Dunnington, that Bates re
 
 *877
 
 marked, addressing himself to Dunnington, that he had a supporter of X, “who could whip any Y man in the crowd”; for there were some persons gathered on the street. And it was
 
 then
 
 that Dunnington answered that he (Dunnington) “was a Y man, and there was no one there who could whip him.”
 

 Some words followed between Bates and Dunnington, but no one seems to have heard them; and Bridges, this accused, was then standing
 
 apart from, them.
 
 Then Bates advanced on Dunnington, cursing and exclaiming to the bystanders, “Get back; and I’ll show him,” whilst Dunnington said at the same moment, “Get back; this is my affair.” And the evidence is all but conclusive that Bates, with an “automatic” in his hand, fired
 
 three times
 
 into Dunnington before the latter fired at all.
 

 Then the firing became general; with the result that, when Bates ceased firing because the magazine of his “automatic” had been emptied, he lay mortally wounded near the curb, struck once in the groin and once in the ankle by bullets from Dunnington’s revolver; a third bullet going astray as Dunnington stumbled towards him and fell over him,
 
 dying;
 
 with the stock of his “pearl-handled, nickel-plated” revolver shattered, and
 
 seven
 
 bullet wounds in the front of his body — ;
 
 also' six m.ore in his huele
 
 — these last put there by this accused,
 
 after
 
 the firing be tween Bates and Dunnington had ceased; his explanation (to the night marshal who arrested him) being, “I had to do it. He was killing my uncle.”
 

 IY.
 

 We therefore find in this record no
 
 proof
 
 of any prior overt act or hostile demonstration on the part of Dunnington towards Bates; we find not even any
 
 evidence
 
 to that effect. Bates sought the difficulty; he knew that Dunnington had
 
 retreated
 
 when his nephew sought to follow and had been stopped by himself. He
 
 returned,
 
 with his nephew, to the place to which he knew Dunnington had retreated; he himself being
 
 then
 
 armed with an “automatic,” and his nephew 'armed with what the witnesses describe as a “big” gun. On leaving, he went
 
 toioards
 
 Dunning-ton, not towards his car, which stood parked in the
 
 opposite
 
 direction. He threw out his
 
 challenge
 
 to Dunnington, and then
 
 advanced
 
 upon him, and
 
 fired first;
 
 and Dunnington was
 
 dying
 
 when he stumbled towards Bates' and
 
 fell over him.
 

 And there is also evidence that Bridges, this accused, was even
 
 supporting Dunning ton
 
 as he was stumbling forward' — and perhaps even then firing into Dunnington’s back. And there is evidence that Bridges fired into Dunnington’s body even as he’ lay
 
 dying
 
 across the uncle’s body.
 

 V.
 

 The trial judge says, “No overt act or hostile demonstration on the part of the deceased has been established.” In this we see no error. The evidence tendered was wholly irrelevant.
 

 Decree.
 

 For the reasons assigned, the judgment appealed from is affirmed. '•
 

 O’NIELL, C. J., concurs in the decree because there was no evidence that Dunnington was the aggressor, and hence no issue as to who was the aggressor in the fatal difficulty.