**164 So. 321**

**STATE v. MAINES.**

No. 33481.

Nov. 4, 1935.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellant.

Gaston L. Porterie, Atty. Gen., Jas. O'Connor, Asst. Atty. Gen., James U. Galloway, Dist. Atty., of Shreveport, and Lessley P. Gardiner, Sp. Asst. Atty. Gen., for the State.

ODOM, Justice.

Defendant was indicted for murder, convicted of manslaughter, and sentenced to hard labor in the State Penitentiary for a term of not less than five nor more than fifteen years. He appealed from the verdict and judgment and presents for our consideration four bills of exception taken during the progress of the trial.

Bill No. 1 involves the question whether the trial judge erred in refusing to permit the coroner to answer the following question propounded by counsel for the defendant:

"Considering your experience in such matters and your observations on the occasion in question, could a person sitting in a normal or near normal position in defendant's car have shot another approaching from the gap with a pistol until the latter had reached a point at or near a line drawn from his position in the car to the tree in front and to the left marked 'A' on plat Def. 6?"

The objection to the question made by the district attorney was that it called for the expression of an opinion by the coroner, which he had no right to express under the circumstances.

The testimony brought up in connection with this bill shows that the fatal encounter between the accused and the deceased took place on a Sunday afternoon in an inclosed field or pasture some forty or fifty yards from a public highway running along the edge thereof. The defendant was the lessee of the property and the deceased a tenant under him. The residence of each was in the field approximately one-half mile from the road and some four-hundred or five-hundred yards apart. There was a roadway leading from each of these residences toward the main highway, the two roads converging in the field, the distance from the point of intersection to the public road being approximately fifty yards. The road from the field to the highway passed through a gate used for animal traffic and a cattle gap used for motor vehicles.

At the time the shooting occurred, the deceased was in the act of moving off the premises. He had loaded his personal belongings into two wagons and two automobiles at his residence, and the two automobiles, in one of which he rode, proceeded out the roadway to the public road, where both stopped to await the arrival

of the wagons, one of which was in charge of a colored man. While these movements were taking place, the defendant was traveling from his residence in an automobile toward the highway, and while on the way overtook the wagon in charge of the colored man and ordered the driver to stop. The defendant had ordered this colored man to leave the premises and not return, and proceeded to upbraid him for disobeying his instructions. Deceased, who was then seated in his automobile parked on the highway, seeing that the colored man was being detained by defendant, left his car, walked back into the field and down the roadway toward defendant. The theory of the state was that defendant, without any provocation whatever except that deceased was walking down the road toward him, opened fire with a revolver and shot deceased to death. Defendant's contention is set out in the brief filed by his counsel, which we quote as follows:

"On the other hand, the defendant would testify that deceased approached over a distance of about forty steps, in a hostile manner, with his left hand over his abdomen and underneath his clothing as if holding a pistol, until he reached a point to the left of and near the front of the car only six or seven feet from defendant, when he, defendant, said, 'Stop !', and deceased drew; that he then picked up his pistol from the seat of the car and both began shooting, and he thought deceased shot first; that he shot in self defense. Manifestly also, defendant would endeavor to sustain his contention by physical facts."

The testimony introduced at the trial shows that both the defendant and the deceased were armed with revolvers; that defendant shot at deceased six times and hit him twice; once in the forehead and once about the abdomen or chest; that deceased fell on his back in the road on the left-hand side of the defendant's car, with one foot touching the front wheel, the body lying at right angles from the car. The testimony shows further that four bullets from defendant's pistol lodged in a tree slightly in front of defendant's car and to the left of the roadway, along which deceased had traveled; that the left front window of the car in which defendant was sitting when all the shooting took place was open, that the windshield was down and not shattered.

The testimony shows also that the deceased shot several times, three of his bullets having entered the left side of defendant's car and one having grazed the left-hand side of it. A photographer visited the scene and made photographs of the car and of the general surroundings. The photographs of the car show plainly the bullet holes in the side. One of the photographs shows the tree referred to and the impression of the bullets. He qualified as an expert in pistol target shooting and testified that the photograph showing the broadside of defendant's car and the bullet holes therein was taken from the direction of the bullets which struck it and from a point on a direct line with the tree struck by defendant's bullets from

the opposite direction. The photographer testified before the jury, and the photographs which he made were introduced in evidence and exhibited to the jury.

Dr. Butler, the coroner, visited the scene, viewed the body of deceased, the automobile with the bullet holes in the side, the tree with its bullet scars, the roadway and other surroundings. He was asked to say whether in his opinion "a person in a normal or near normal position in defendant's car could have shot another approaching from the gap with a pistol until the latter had reached a point at or near a line drawn from his position in that car to the tree in front and to the left marked 'A' on plat Def. 6." He was asked to express his opinion based on his "experience in such matters and your observations on the occasion in question." In other words, he was asked to express an opinion based upon physical conditions and facts as he had observed them, the same physical conditions and facts which had been detailed minutely by the witnesses to the jury and which were shown plainly by the exhibited photographs and certain pencil drawings.

In State v. Willis, 181 La. 154, 158 So. 826, 827, the state called the coroner and a deputy sheriff as witnesses and asked them if in their opinion a shotgun found on the premises of the party accused of the crime had been recently discharged. The defense objected to the testimony on the ground that the witnesses were not expert in the science called ballistics—the science of the motion of projectiles. The witness qualified as an expert to this extent only, that "from many years of experience. he could tell from the odor and appearance of the burned powder in the barrel of a shotgun if it had been fired recently." The testimony was permitted to go to the jury over the objection of defendant's counsel. We sustained the court's ruling, not upon the theory that the witnesses had qualified as experts, but because nonexpert witnesses may express their opinions based upon facts which they have observed, provided they state the facts to the jury. In the course of our opinion, we said:

"The rule which forbids a nonexpert witness to express his opinion has reference to scientific subjects on which an individual's opinion is of no value unless he is versed in the particular science. But, as to subjects on which any person of experience may form an accurate opinion from the facts which he has observed, a nonexpert witness may give the jury the benefit of his opinion, provided he states the facts on which the opinion is founded, because then the jury also is governed by the facts, in determining whether the opinion is well founded."

Under our ruling in that case, it is true that the coroner's opinion, based upon the physical facts as he had observed them, was admissible in evidence. Even so, the following statement made by us in the course of our opinion in that case must not be overlooked. We said:

"There is no danger that a jury will attach too much importance to the opinion of the witness in such a case, as when one

testifies that from the odor and appearance of the burned powder in the barrel of a shotgun and from his long experience in such matters he is of the opinion that the gun was fired recently, provided he states the facts on which his opinion is founded. What makes such testimony admissible is that there is no danger of deception. Whatever objection there may be to such testimony has reference to its sufficiency or its effect, not its admissibility."

Certainly the members of the jury in the case at bar, presumably possessed of ordinary common sense, were capable of drawing a reasonably accurate conclusion from the physical facts detailed by Dr. Butler and other witnesses and from the photographs and drawings exhibited to them, as to the approximate position of deceased when the shooting was going on. They knew as well as Dr. Butler did where the deceased fell and the position of his body when picked up; they knew that the windshield of the car was down and not shattered; they knew that the left front window of the car was open and that four bullets from defendant's pistol had struck a tree slightly in front and off to the left of the car in which defendant was sitting when he shot at deceased six times, and they knew, of course, that defendant intended to hit deceased with the bullets from his pistol which struck the tree. And they knew also that three bullets from the deceased's pistol had gone into the side of defendant's car, because they had before them a photograph showing it, and they had the testimony of the photographer to the effect that the photograph showing

the broadside of the car was taken from the direction of the bullets which struck the tree and from a point on a direct line with the tree struck by bullets from the opposite direction. The members of the jury knew the physical facts as well as Dr. Butler did. Dr. Butler was called upon to express an opinion, not based on nor gained by the study of any scientific subject, but gained from physical facts which any intelligent man could understand and from which he could draw as correct conclusions as could a physician.

When juries have presented to them facts such as those above detailed, they are competent to and do, as a matter of fact, form their own conclusions touching such points as the one here involved, and it is not probable that the jury in this case would have let the opinion of Dr. Butler sway them from their own. As we said in the Willis Case, supra, "There is no danger that a jury will attach too much importance to the opinion of the witness in such a case. * * * What makes such testimony admissible is that there is no danger of deception."

Conceding then that the opinion evidence sought to be introduced in this case was admissible and that the judge erred in his ruling excluding it, the error, we think, was harmless, and resulted in no prejudice to the defendant. It is not reasonable to assume that the members of the jury would have been influenced by Dr. Butler's opinion based on physical facts about which they knew as much as he and from which they were as competent to draw conclusions as he was.

Article 557 of the Code of Criminal Procedure reads as follows:

"No judgment shall be set aside, or a new trial granted by any appellate court of this State, in any criminal case, on the grounds of misdirection of the jury or the improper admission or rejection of evidence, or as to error of any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right."

We do not think the error complained of, if error there was, has probably resulted in a miscarriage of justice, or was prejudicial to the substantial rights of the accused, or that it constituted a substantial violation of the constitutional or statutory rights of accused.

Bills No. 2 and 3 are related and discussed together. When the accused was on the stand as a witness in his own behalf, his counsel asked him what threats deceased had made against him. Another witness was called by defendant and testified that he had sold deceased some pistol cartridges a few weeks before and was then asked by defendant's counsel what deceased said at the time about his purpose in buying the cartridges. Counsel for defendant announced that his purpose in asking the questions was to prove that deceased had made threats against the accused. The district attorney objected to both questions on the ground that there had been no proof that deceased had committed an overt act or made a hostile demonstration toward the accused. The objection was sustained and Bills No. 2 and 3 were reserved.

The trial judge said in his per curiam to these bills that he sustained the objection because the accused had not laid the proper foundation for the introduction of such testimony in that it was not proved to his satisfaction that deceased had committed any overt act or made any hostile demonstration toward accused.

 Counsel for the accused concede that the jurisprudence of this state is settled to the effect that in prosecutions for murder when the plea is self-defense, evidence as to the dangerous character of the deceased and prior threats by him against the accused "is inadmissible until and unless an overt act or hostile demonstration by him toward accused has been proved to the satisfaction of the trial judge." But they invoke another rule, equally as well settled, which is that if the trial judge decides that no overt act or hostile demonstration was made, his ruling is subject to review by this court on appeal. State v. Brown, 172 La. 121, 133 So. 383; State v. Bridges, 175 La. 872, 874, 144 So. 602; State v. Jones, 175 La. 1066, 145 So. 9; State v. Scarbrock, 176 La. 48, 145 So. 264.

 The testimony on which the defendant relies to support his contention that deceased committed an overt act or made a hostile demonstration toward the accused

is in the record. Our review of it satisfies us that the trial judge made no error in ruling as he did on this point.

The only evidence of an overt act or hostile demonstration in this case is that given by the accused himself. However, counsel for defendant rely to some extent upon the physical facts detailed above. Defendant's own testimony on this point is set out in the bill of exceptions, from which we quote as follows:

"That when he stopped deceased got out of the car in the public highway and started back hurriedly, in an angry manner, waved with his right hand to the negro, saying, 'Drive on,' all the while after passing through the gap holding his left hand over his stomach and in his clothing as if it were on a pistol; advancing without halt until within about six feet of defendant and directly between him and the tree heretofore shown as the receptacle of all of the bullets from defendant's pistol except the two that entered deceased's body; that he, defendant, at that point said, 'Stop!'; whereupon deceased drew; defendant drew; the shooting began; he felt sure deceased shot first."

It will be noted that defendant says that deceased left his car on the highway "and started back hurriedly in an angry manner, waving with his right hand to the negro, saying, 'Drive on.'" Knowing that the negro was assisting deceased in moving his property from the premises, defendant should have realized that deceased was interested in seeing that the wagon moved on. He says that deceased beckoned to the negro with his right hand and ordered him to move on. Defendant therefore had reason to believe that deceased, in walking down the road toward him, had a motive in doing so other than to do him bodily harm. So that the fact that deceased walked toward him hurriedly or even "in an angry manner" was not sufficient ground, under the circumstances, on which to base a reasonable conclusion that his life was in immediate danger or that he was in danger of suffering great bodily harm. But the defendant goes further and says that while the deceased waved his right hand to the negro he was "holding his left hand over his stomach and in his clothes as if it were on a pistol."

While the bill of exceptions does not show this, we find that the defendant said in his testimony attached that deceased drew the gun from his bosom with his left hand and "then caught it with both hands and fired first." The testimony as a whole on this point is summarized by the trial judge in his per curiam as follows:

"Out of six eye witnesses (including accused) to the killing, five testified that the deceased, when fired on and shot by accused, was standing or walking in the road near the point where the accused had intercepted the deceased's loaded wagon with its driver; that deceased was dressed in trousers, shirt and vest, with both hands at his side; that he made no hostile demonstration or movement toward the accused; that the deceased addressed no word to the accused, but said to the negro driver of the wagon, Isaiah Wallace, "Isaiah, drive on", and at one time beck-

oned to him with his hand to drive on; that the first shot fired by accused struck the deceased causing him to half fall and stumble forward in a doubled-up or stooped position; and that it was only after deceased had been so fired upon and shot by the accused, the deceased drew his gun from his right hip pocket and with both hands raised it sufficiently to fire four shots in the direction of accused, seated in his car, one bullet grazing accused across the top of his instep before one bullet from accused's gun struck deceased in the forehead killing him instantly."

The testimony as a whole falls short of constituting "proof" of any overt act, and the law requires "proof," not mere evidence. State v. Bridges, supra; State v. Sandiford, 149 La. 933, 934, 90 So. 261; State v. Poole, 156 La. 434, 100 So. 613.

"Proof is that quantity of appropriate evidence which produces assurance and certainty. * * * Proof is that degree and quality of evidence that produces conviction. Whenever all the evidence is of such a character as to convince an intelligent and conscientious man of a fact, then that fact is proved." Words and Phrases, First Series, Vol. 6, p. 5684.

The trial judge was of the opinion that there was no proof of an overt act. We think he made no error.

Bill No. 4 was reserved to a statement made by the district attorney in his argument to the jury that there had been no evidence of prior threats by the deceased toward defendant and that "the judge had refused to permit the introduc-

tion of evidence of such prior threats because an overt act or hostile demonstration by deceased toward the defendant at the time of the killing had not been proved."

The record discloses that defendant's counsel promptly objected to that statement as an improper comment on the judge's ruling on a question of fact, and that the judge promptly sustained the objection and admonished the jury to pay no attention to the remarks of the district attorney, as they were the sole judges of the facts. The district attorney, in resuming his argument, concurred in the admonition and made no further reference to that point.

It is argued by counsel for defendant that even though the district judge instructed the jury to disregard the remarks made by the district attorney, the impression made upon their minds could not thus be eradicated.

It appears that the judge in the presence of the jury sustained the objection of the district attorney to the introduction of testimony sought to be introduced showing prior threats on the ground, as stated by the district attorney, that there was no proof of a hostile demonstration or an overt act. It was contended by counsel for defendant that such ruling in the presence of the jury was equivalent to a comment on the facts by the district judge, which is not permissible under our system. We think, however, that even if it be conceded that counsel are correct in their view, they have no right to complain for the reason that it appears from the judge's per curiam that when these questions were

first propounded to the witness and the objection was made, he promptly had the jury removed, and that the matter was discussed out of the presence of the jury, and that the judge stated that he would sustain the objection and stated his reasons for doing so. Whereupon the jury was returned to the courtroom, when the same question was again propounded to the witness by defendant's counsel. Whereupon the judge suggested that the jury be again removed from the courtroom. Then counsel for accused stated to the court that he wanted the objection and the ruling of the court made in the presence of the jury. The judge seems to have done all he could to prevent the jury from hearing his rulings and his reasons therefor.

Aside from this, however, the possibility that the accused was prejudiced by what took place in their presence is remote indeed. In State v. Weathers, 127 La. 930, 54 So. 290, it was held that "the fact that the trial judge, in the presence of the jury, in a criminal prosecution for shooting with intent to murder, sustains an objection to testimony going to show the dangerous character of the man who was shot, on the ground that no overt act on his part immediately preceding the shooting had been proved, is not a good ground for the setting aside of the conviction, where it does not appear that any request for the withdrawal of the jury was made." In that case the court said: "As the matter stands, the possibility of such prejudice is too remote to call for a reversal of the verdict and judgment appealed from."

In the case at bar there was not only no request for the withdrawal of the jury, but counsel for defendant insisted that the court's ruling be made in the presence of the jury. See State v. Hickerson, 157 La. 852, 103 So. 189.

Bill No. 5 was taken to the refusal of the judge to grant a new trial. The motion for a new trial sets forth that the judge erred in his rulings on the points discussed above in connection with the various bills of exception. As we have ruled on all these points, we shall not refer to them again.

Since the case was submitted to this court, counsel for appellant have filed a plea attacking the constitutionality of article 482 of the Code of Criminal Procedure. The plea comes too late. See State ex rel. Porterie, Attorney General, v. Jones, 181 La. 390, 159 So. 594.

For the reasons assigned, the conviction and sentence are affirmed.

FOURNET, J., concurs in decree.

O'NIELL, C. J., dissents.