Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,776-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

STEVE DEROZAL WILLIAMS                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 358,612

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPEALS AND
WRIT SERVICE                              Counsel for Appellant
By: Remy V. Starns
    Justin C. Harrell


JAMES EDWARD STEWART, SR.                 Counsel for Appellee
District Attorney


REBECCA ARMAND EDWARDS
MARGARET E. RICHIE GASKINS
Assistant District Attorneys

* * * * *


Before PITMAN, STONE, and MARCOTTE, JJ.

**MARCOTTE, J.**

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Ramona Emanuel presiding. Defendant Steve Williams ("Steve") was convicted of second-degree murder and sentenced to life at hard labor without benefits. He now appeals his conviction and sentence. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

On August 15, 2018, Steve was charged by bill of indictment with the second-degree murder of Terry Brown ("Mr. Brown"), in violation of La. R.S. 14:30.1. The offense occurred on June 7, 2018. Steve pled not guilty.

On December 7-11, 2021, a trial was held where the following evidence was adduced. Tamika Williams ("Tamika") testified that in 2018, she had been married to Steve for 24 years, and they had been together for 27. Together, they had three boys, a family home with a pool, and they had just welcomed their first grandchild. They often took trips together and had an active social life. However, Steve underwent a total hip replacement surgery, and complications in his recovery from that surgery curtailed the social life and travel previously enjoyed by the couple.

In February 2017, Tamika said she met Mr. Brown on Facebook and began messaging with him. She was frustrated by the lifestyle changes wrought by Steve's health decline and confided in Mr. Brown that her marriage was crumbling. The friendship between the two turned intimate around December 2017.

At the time, Tamika said she was working as a private sitter for an elderly woman on Pebble Beach Drive in Shreveport. Mr. Brown would often bring her lunch where they would discuss their plans to be together. A

barber by trade, Mr. Brown would also on occasion cut Tamika's hair.  In addition to her intimate relationship with Mr. Brown, Tamika remained intimate with Steve.

Steve discovered Tamika's affair with Mr. Brown in January 2018.  In March 2018, Steve and Tamika were in Steve's vehicle discussing their relationship and her affair with Mr. Brown.  At some point during the discussion, either Mr. Brown called Tamika or Tamika called the victim.  Immediately after the incident, Tamika told police that Steve had become very upset and told Mr. Brown to meet him somewhere.  During her testimony at trial, Tamika claimed that the victim said he was coming over to the Williams family residence to harm them.  Immediately after the incident, Tamika told police that, as she and her husband arrived home and were walking inside, she heard a gun click, saw Steve pull a gun, heard a gunshot, and fled the home because she wanted to hide from her husband.  At trial, Tamika testified that, when she and her husband arrived home, she heard a sound like metal hitting the ground, heard a gunshot, and then fled because Mr. Brown had been threatening her husband and she was afraid that Mr. Brown had come to the Williams family residence.  As a result of this incident, Steve was arrested for discharging a firearm.

Following this incident, Tamika left the marital home to live with Mr. Brown in his apartment.  On the morning she left him, Steve, who testified in his own defense, said that he drove his wife to work to drop her off and found Mr. Brown there waiting on her.  Steve testified that he confronted Mr. Brown stating, "Why are you doing this?"  He said that Mr. Brown responded by brandishing a baseball bat he retrieved from his vehicle.  Steve said that he was frightened for his safety and quickly left the scene.  He also

2

said that he started carrying a handgun after this incident. Steve further testified that Mr. Brown's harassment of him grew serious enough that he made a police report.

During this time, Mr. Brown would drop Tamika off and pick her up from work, but Steve would still sometimes bring her lunch and beg her to come home. Tamika eventually relented and returned to the marital home. She couldn't let Mr. Brown go, however, and continued to talk with and see him. She also continued to sleep with both men. Tamika eventually moved back in with Mr. Brown.

In April 2018, she also announced to both men that she was pregnant and did not know which man was the father. Tamika testified at trial that she never had a partial hysterectomy and that she had a menstrual cycle, had been pregnant in April 2018, and had miscarried that pregnancy. However, her family doctor testified at trial that Tamika's uterus had been surgically removed prior to 2018 and that she was physically incapable of carrying a pregnancy or having a menstrual cycle.

In May 2018, Steve had enough and told Tamika that she needed to choose which man she wanted to be with. Tamika decided to move back home yet again, and she told Mr. Brown that they were done. Mr. Brown requested his apartment key back. Tamika said that she and Steve met Mr. Brown and Steve returned his apartment key to him. The two men shook hands and appeared to bury the hatchet. Tamika, however, continued to see and sleep with both men.

On June 6, 2018, Steve dropped his wife off at work at the home on Pebble Beach Drive and when he returned to pick her up, he noticed that she had a fresh haircut. At that point, Tamika admitted that Mr. Brown had

come to see her and cut her hair that day. Steve became enraged. He called Mr. Brown, threatened him with bodily harm, and told him that he was "coming to get [him]" with a firearm. Mr. Brown called 911 and reported the incident. He later met SPD officers, who escorted him to his apartment and stayed with him for some time, but Steve never showed up.

The following day, June 7, 2018, Steve again brought Tamika to work. He told her that he would be back later to pick her up. Expert analysis of cell phone records indicates that, after dropping his wife off at work, Steve spent the morning driving around the neighborhood while making phone calls and never left the neighborhood prior to the homicide. Steve called Tamika's brother, Roderick Jefferson, that morning. Mr. Jefferson testified that Steve told him that he thought he had seen Mr. Brown's car in the neighborhood after he dropped off Tamika. Steve returned to the house at Pebble Beach Drive later that morning, and he saw Mr. Brown's car. Steve also saw Tamika and Mr. Brown outside the residence standing together.

Immediately after the homicide, Tamika told police that Steve was holding a gun when he exited the truck. However, she testified at trial that Steve was not holding a gun when he exited the truck and, instead, held his hands in the air. Immediately after the homicide, Tamika told police that Steve walked toward Mr. Brown holding the gun, Mr. Brown began running away in the opposite direction, and Steve began chasing and shooting at Mr. Brown as Mr. Brown tried to escape.

SPD officers who responded to the scene confirmed that Tamika told them that Steve had "chased (the victim) around the yard, shot three to four times, stood over him and shot again." Neighbors called 911 and emergency

4

medical personnel arrived and transported the victim to the hospital. Mr. Brown, however, succumbed to his injuries and was pronounced dead shortly after arriving at the hospital.

According to Tamika's trial testimony of the events that day, Mr. Brown "called out with his name and told [Steve] that it ends today," before "proceeding to run to the passenger side of his truck" as if attempting to retrieve something. She said that only then did Steve "reach into the vehicle and get the gun out the truck and start shooting as Terry Brown was running toward him." However, in four different interviews with various law enforcement personnel soon after the incident, Tamika's story was consistent that Steve immediately got out of the truck with a gun, advanced on Mr. Brown and started shooting him.

In Steve's description of the events that day, he said that "[Mr. Brown] pushed [Tamika] and charged me. I don't know if he was just pushing her like that, and he charged me and that's when I came out with the gun and I shot him."

Tameca Plater, Mr. Brown's sister, testified that she learned of her brother's romance with a married woman when she came to visit him in October 2017. Ms. Plater stated that Mr. Brown had been told by Tamika that she was pregnant, which she found hard to believe since her brother had a vasectomy. She also said that her brother told her in June 2018 that his relationship with Tamika was over and that the only contact between them going forward would be for the sake of the baby. Ms. Plater further testified that she was surprised to hear about her brother's murder because about two weeks before the incident, her brother told her that he and Steve had resolved their differences and they shook hands.

5

Chandra Craig, who was on the porch of her mother's house near where the incident occurred, testified that she saw Steve drive up to the house where Tamika was working. She said that she observed Steve park in front of the house and exit his vehicle in a "zombie-like" fashion with a gun in his hand. She then ran inside her mother's house and heard multiple gunshots. When she looked back over to where the gunshots came from, she saw Mr. Brown stumble and fall to the ground near his truck. She said that he had been shot.

Charles Ball was performing lawn service at Ms. Craig's mother's house when he heard four to five gunshots coming from the house on Pebble Beach Drive. He then called 911. A recording of his 911 call was played for the jury, and Mr. Ball verified that it was the call he made. He said that he approached Mr. Brown, attempted to render aid to him, and could hear him say "don't let me die." He said he asked Tamika how many times the victim had been shot, and she responded, "he unloaded the clip."

Detective Kenneth Thompson ("Det. Thompson") was a homicide detective with the Shreveport Police Department ("SPD") at the time of the shooting. He responded to and observed the crime scene. Det. Thompson testified that he interviewed Tamika after the incident, and she told him that her estranged husband shot Mr. Brown. A recording of the interview was played for the jury, and Det. Thompson confirmed that it was authentic. Det. Thompson also interviewed Steve and that interview was recorded and played for the jury as well. Det. Thompson also obtained search warrants for the phone records of both Steve and Tamika.

SPD Sergeant Richard McDonald ("Sgt. McDonald") testified that he spoke with Tamika upon arriving at the scene, and she told him that her

husband chased her boyfriend around a vehicle in the front yard and shot him several times before fleeing in a white Chevrolet Colorado. Sgt. McDonald made a video recording of his interaction with Tamika, and that video was played for the jury.

SPD Sergeant Brad Sotak ("Sgt. Sotak") testified that he interviewed Tamika after the incident. He was surprised by her demeanor because she "didn't seem very upset" and appeared "kind of ambivalent" to what was going on. Sgt. Sotak's interaction with Tamika was recorded and a copy was played for the jury.

SPD Corporal Amber Futch ("Cpl. Futch"), a crime scene investigator, testified that she took photographs of Mr. Brown from the hospital documenting his injuries. She also took photographs of Steve's truck once he turned himself in at the police station. The photographs were shown to the jury. Cpl. Futch also said that she test-fired the 9-millimeter handgun used by Steve and noted that it was functional and had no problem ejecting shells.

Detective Marlon Clark ("Det. Clark"), an SPD homicide detective, testified that he was able to locate five shell casings from the area where Mr. Brown was shot. He also interviewed Steve later that day, and a recording of that interview was published to the jury. In the interview, Steve said that he saw Mr. Brown hugging Tamika, which is why he ran at him and shot him. Steve also said that he never saw Mr. Brown with a weapon of any kind. On cross-examination, Det. Clark conceded that Steve also told him that Mr. Brown had threatened him once before.

James Traylor is a medical doctor and forensic pathologist who performed the autopsy on Mr. Brown. He testified that Mr. Brown was shot

six times, five of which were perforating and one of which penetrated his lung and became lodged there. He said that the various locations of the gunshot wounds were on Mr. Brown's back, side, and hand. He also noted that the gunshot wounds on Mr. Brown's back were entry wounds. Dr. Traylor testified that none of the wounds corroborate the idea that Mr. Brown was charging at Steve when Steve shot him.

Corporal Robert Cerami ("Cpl. Cerami"), an SPD certified crime-scene reconstructionist, took photographs of the crime scene which were shown to the jury. One photograph included a baseball bat, which Cpl. Cerami said was taken from behind the driver's seat of Mr. Brown's car. He also collected the 9-millimeter handgun from inside the glove box of Steve's truck and confirmed that it was the same gun used in the shooting. Cpl. Cerami also testified that the most likely explanation for what happened on the day of the incident is that Steve pulled up alongside the curb in front of the residence, exited his truck, and advanced toward the garage. Steve then shot once at the victim, which was likely the bullet that struck Mr. Brown in the hand. Mr. Brown then turned and began to run toward the driver's side of the car and the front lawn grass. Steve then shot Mr. Brown three more times in the back from a distance and then two final times as he stood directly over him.

A 9-millimeter Taurus handgun was recovered from Steve's vehicle, along with an empty magazine. The gun was empty and had no projectile loaded into it. All of the shell casings recovered from the scene were fired by a 9-millimeter weapon. An ATF report on the Taurus handgun indicated that it had been purchased by Steve's son approximately 19 days prior to the homicide.

8

Jimmie Bates, Tamika's hairdresser, testified regarding a telephone call that she overheard between Steve and Mr. Brown in which Mr. Brown told Steve something to the effect of "you better hope I don't beat you up on the streets."

The 12-member jury returned a unanimous guilty verdict. On March 15, 2022, the trial court denied Steve's motion for a new trial and motion for post-verdict judgment of acquittal and sentenced him to life in prison without benefits. The trial court informed Steve of his appellate and post-conviction relief time restraints.

Steve now appeals.

## DISCUSSION

*Sufficiency of the Evidence*

Steve argues that the evidence was insufficient to establish that he was guilty of second-degree murder. He contends that "after months of escalating rhetoric, including threats, harassment, a police report, and one particularly terse exchange with [Mr. Brown] brandishing a baseball bat, [he] was living in fear." Steve claims that on the day of the incident, he exited his vehicle with his hands in the air and the firearm in his pocket. He says that he only opened fire after Mr. Brown charged toward him telling him, "it ends today" and "don't let me make it in the truck" where a baseball bat was stowed behind the seat. Steve argues that these facts present a straightforward case of self-defense. He asserts that his decision to shoot Mr. Brown was not malicious but rather a direct response to an imminent threat to his life.

Even taking the state's view of the facts, Steve contends that the evidence does not support the specific intent required for second-degree

murder. He claims that the record shows "a volatile love triangle marked by months of escalating strain, harassment, threats, and physical intimidation." Steve argues that these conditions are recognized by Louisiana law as capable of producing the "sudden passion or heat of blood" that mitigates a homicide to manslaughter. He states that he was reacting to a situation "in the grip of fear, provocation, and intense emotional disturbance." Steve argues that, at most, the evidence supports manslaughter rather than the deliberate and unprovoked killing necessary to sustain a conviction for second-degree murder.

The state argues that the evidence presented was clearly sufficient for the jury to have reached a verdict of second-degree murder because Steve had the specific intent to kill Mr. Brown. The state contends that nothing in the evidence suggests Steve acted in self-defense or in a sudden passion. Based on the evidence, a rational juror could have found beyond a reasonable doubt that Steve committed the second-degree murder of Mr. Brown.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified in La. C. Cr. P. art. 821, does not afford the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v.*

*Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed 2d 90 (2004).

When a defendant challenges the sufficiency of the evidence in a self-defense case involving a homicide, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Jackson*, 55,312 (La. App. 2 Cir. 11/15/23), 374 So. 3d 354. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger or when committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention.

11

La. R.S. 14:20 (A)(1) and (2). The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing. La. R.S. 14:20(A)(2). A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.

Manslaughter is defined as a homicide which would be murder under either La. R.S. 14:30 (first degree murder) or La. R.S. 14:30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. *Id*. Manslaughter is also a homicide committed without any intent to cause death or great bodily harm. La. R.S. 14:31(A)(2).

For murder to be reduced to manslaughter, the following must be proved: (1) the homicide was committed in sudden passion or heat of blood; (2) that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *State v. Johnson, supra*.

12

In any criminal proceeding in which the justification of self-defense is raised pursuant to La. R. S. 14:19 or 20, the state shall have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense.  La. C. Cr. P. art. 390(A).

When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense.  *State v. Matthews*, 464 So. 2d 298 (La. 1985); *State v. Cook*, 46,843 (La. App. 2 Cir. 1/25/12), 86 So. 3d 672, *writ denied*, 12-0640 (La. 6/22/12), 91 So. 3d 969.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.  La. R.S. 14:30.1(A).  Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.  La. R.S. 14:10.  Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant.  *State v. Graham*, 420 So. 2d 1126 (La. 1982).  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person.  *State v. Seals*, 95-0305 (La. 11/25/96), 684 So. 2d 368.  It may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries.  *State v. Jackson, supra*.

We find that there was sufficient evidence to support Steve's conviction for second-degree murder.  At trial, the credible testimony of a disinterested eyewitness proved that Steve exited his vehicle holding a

13

weapon and was therefore the aggressor in the confrontation. Moreover, Tamika's initial statements to the police indicated that Steve walked toward the victim holding the gun, the victim began running away in the opposite direction, and Steve began chasing and shooting at the victim as the victim tried to escape. We also note that Steve himself admitted to police that Mr. Brown was unarmed at the time of the homicide. Accordingly, we find that the jury was well within its discretion to reject the self-serving testimony of Steve and his wife that he acted in self-defense.

Steve's manslaughter argument is similarly unpersuasive. The facts at trial showed that Mr. Brown was shot six times, but two of those shots were inflicted after he had already fallen to the ground. Thus, even if Steve had been enraged at the time of the homicide, once Mr. Brown fell down, Steve had an opportunity to cool off and stop shooting. Instead, he approached the wounded victim, stood over his body, and fired two more rounds until the clip was empty. In our view, the evidence showed premeditation rather than immediate provocation. Accordingly, we do not find that the mitigatory factors of sudden passion or heat of blood necessary for manslaughter were present.

This assignment of error is without merit.

*Admissibility of Character Evidence*

Steve argues that the trial court erred in prohibiting him from admitting evidence of Mr. Brown's "violent character and criminal past" to demonstrate his "reasonable subjective fear" of Mr. Brown. Steve claims that his and Tamika's testimony about Mr. Brown charging at him was enough to meet the "overt act" requirement of La. C.E. 404(A)(2)(a) such that evidence of pertinent character traits of Mr. Brown should have been

14

admissible. Despite meeting the "overt act" requirement, Steve complains that the trial court repeatedly prohibited him from exploring Mr. Brown's criminal history and past instances of violence, including potential sexual assault. He also notes that the court repeatedly prohibited Tamika from describing Mr. Brown's threats against Steve. Steve claims that "by foreclosing the very character evidence the overt act unlocked, the court deprived the jury of critical context necessary to assess [his] state of mind and to determine the true aggressor."

The state argues that the trial court correctly prohibited Steve from introducing evidence of Mr. Brown's character. The state asserts that Louisiana courts have consistently held that the evidence of an overt act presented by a defendant must be "appreciable evidence," and a defendant's self-serving testimony that is sufficiently contradicted by other evidence does not constitute "appreciable evidence" of an overt act.

Both the Sixth Amendment of the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. *State v. Van Winkle*, 94-0947 (La. 6/30/95), 658 So. 2d 198. However, this right does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. La. C.E. art. 403; *State v. Mosby*, 595 So. 2d 1135 (La. 1992); *State v. Johnson*, 41,428 (La. App. 2 Cir. 9/27/06), 940 So. 2d 711, *writ denied*, 06-2615 (La. 5/18/07), 957 So. 2d 150.

Although evidence of a person's character or a trait of his character is generally inadmissible for the purpose of proving that he acted in conformity therewith on a particular occasion, it may be introduced to support a plea of

15

self-defense.  *State v. Burton*, 19-01079 (La. 6/30/21), 320 So. 3d 1117.

This type of evidence is admissible in support of a plea of self-defense in a

murder prosecution for two distinct purposes: (1) to show defendant's

reasonable apprehension of danger which would justify his conduct; and (2)

to help determine who was the aggressor in the conflict.  *State v. Lee*, 331

So. 2d 455 (La. 1975).  Evidence of the decedent's dangerous character or of

his threats against the accused may be admissible in support of his plea of

self-defense, provided that the accused first produces evidence that the

decedent had made a hostile demonstration or overt act against the accused

at the time of the incident.  *Id.*  An overt act is any act of the deceased that

manifests to the mind of a reasonable person a present intention on his part

to kill defendant or do him great bodily harm.  *Id*., *quoting State v. Brown*,

172 La. 121, 133 So. 383 (1931).  A defendant's unsupported, self-serving

testimony that is sufficiently contradicted by other evidence does not

constitute appreciable evidence of an overt act or hostile demonstration on

the part of the victim.  *State v. Kennell*, 54,577 (La. App. 2 Cir. 6/29/22),

342 So. 3d 437.

In this case, Steve failed to present appreciable evidence that Mr.

Brown made a hostile demonstration or overt act against him that would

then allow him to introduce evidence of Mr. Brown's character.  The only

evidence available to prove a hostile demonstration or overt act was Steve's

unsupported and self-serving statement that Mr. Brown came running

toward him.  However, this testimony was contradicted by forensic

pathologist Dr. Traylor, who testified that none of the victim's wounds were

consistent with a scenario in which the victim was running toward Steve and

that two of the bullet wounds were inflicted while the victim was already lying prone on the ground.

We also note that, in his own statement to police, Steve admitted that Mr. Brown was unarmed. Thus, even if Steve's statement about Mr. Brown advancing on him was true, this would not qualify as an "overt act" because it would not cause a reasonable person to believe that an unarmed Mr. Brown intended to kill him or do him great bodily harm. The trial court did not err in determining that Steve could not introduce evidence of Mr. Brown's behavior because he failed to demonstrate that Mr. Brown made a hostile demonstration or overt act against him at the time of the incident. This assignment of error lacks merit.

*Recording and Transcription of Bench Conferences*

Steve also argues that his due process rights were violated by the failure to record and transcribe bench conferences and sidebars relevant to the trial court's rulings regarding the admission of Mr. Brown's criminal past. Steve notes that of the twelve bench conferences during the trial, three related to Mr. Brown's character and prior bad acts, the state's Rule 404 objections, and the court's rulings. Steve complains that since these conferences were not memorialized, reversal is mandated because "the record is so incomplete that the appellate court cannot ascertain the basis of the lower court's ruling." He contends that this restriction on his right to demonstrate Mr. Brown's prior bad acts to the jury "robbed him of both the opportunity to establish that [Mr. Brown] was the first aggressor and to explain [his] subjective fear of the victim."

At the outset, we note the well-settled law that a defendant must make a contemporaneous objection in order to preserve the error for direct review.

La. C. Cr. P. art. 841; *State v. McLaughlin*, 54,874 (La. App. 2 Cir. 3/1/23), 357 So. 3d 551, *writ denied*, 23-00459 (La. 9/26/23), 370 So. 3d 472.

Here, Steve's trial counsel never contemporaneously objected to the trial court handling these evidentiary matters in bench conferences and sidebars. Steve's trial counsel also never made a proffer of that evidence outside the presence of the jury in order to preserve the substance of that evidence for appeal. Accordingly, Steve has waived the right to complain of such errors on appeal.

However, even if this issue had been preserved for appellate review, the Louisiana Supreme Court "has never articulated a *per se* rule either requiring the recording of bench conferences or exempting them from the scope of La. C. Cr. P. art. 843." *State v. Deruise*, 98-0541, p. 14 (La. 4/3/01), 802 So. 2d 1224, 1236. The Louisiana Supreme Court has held that, when a defendant fails to show any specific prejudice from the failure to record bench conferences and sidebars, the failure of the court reporter to record their substance does not constitute reversible error. *Id.* at 1237.

Here, Steve was permitted to testify that he feared Mr. Brown and about how Mr. Brown threatened him on multiple occasions. Steve was also allowed to testify that Mr. Brown verbally threatened to "whip [Steve's] ass." Steve and his wife were both allowed to testify that Mr. Brown had previously threatened Steve with a baseball bat. Steve's wife was also allowed to testify that she "heard Terry Brown speak of bodily harm several times toward my husband."

In short, Steve was permitted to introduce other evidence establishing his state of mind and alleged fear of Mr. Brown at the time of the homicide. Thus, Steve suffered no prejudice from the failure to record bench

18

conferences and sidebars related to evidence of Mr. Brown's character, and the failure to record them does not constitute reversible error.

*Sentencing Delay*

Finally, Steve argues that the trial court erred in failing to observe the 24-hour sentencing delay the law requires. At the post-verdict hearing on March 15, 2022, the trial court denied his motion for a new trial and motion for judgment of acquittal. Steve notes that at that point the trial court was required under La. C. Cr. P. art. 873 to either delay sentencing for 24 hours or seek his waiver of the delay. Since the trial court did neither, Steve argues that the trial court committed reversible error requiring this court to vacate his sentence and remand the matter for resentencing.

It is undisputed that the trial court failed to follow the sentencing delay required by La. C. Cr. P. art. 873. However, that failure is subject to a harmless error analysis. *State v. Bodine*, 52,205 (La. App. 2 Cir. 9/26/18), 257 So. 3d 249, *writ denied*, 18-1756 (La. 3/25/19), 267 So. 3d 597. This court has consistently held that "vacating a sentence for the failure to observe the 24-hour delay is not required if the error is harmless and no prejudice is shown." *Id*.

Here, we note that Steve was convicted of second-degree murder, which carries a mandatory life sentence. Thus, while the language in La. C. Cr. P. art. 873 is mandatory, when the sentence given is statutorily required, then the trial court's failure to observe the 24-hour period can be considered harmless error as the trial court had no discretion in the sentence imposed. *State v. Palmer*, 56,313 (La. App. 2 Cir. 7/16/25), 416 So. 3d 863. Delay or no delay, the sentence the judge was required to impose would have been the same. *State v. Seals*, *supra*.

19

We also note that there was sufficient delay between the conviction and the sentence. In *State v. Austin*, 49,601 (La. App. 2 Cir. 7/16/14), 146 So. 3d 716, this court determined that the trial court's failure to observe the 24-hour delay was harmless because over two months passed between the conviction and sentence and because the trial court had ample time to fully consider the sentence to be imposed. *See also State v. Bodine, supra*, (holding that "a court's failure to observe the 24-hour delay is harmless where sufficient delay has occurred between the date of the conviction and the date of sentencing, where there is no indication that the sentence was hurriedly imposed, and where the sentence imposed is mandatory.").

Here, the trial court had three months and four days within which to fully consider Steve's sentence, and the trial court heard extensive arguments from both sides on his motion for a new trial prior to ruling on that motion and sentencing him. Thus, there is no evidence that the sentence was hastily imposed nor is there any evidence of prejudice.

For these reasons, despite the trial court's failure to adhere to the requirements of La. C. Cr. P. art. 873, we affirm the mandatory life sentence without parole, probation, or suspension of sentence imposed by the trial court.

## CONCLUSION

For the reasons expressed, Steve's conviction and sentence are affirmed.

**AFFIRMED.**